638 S.E.2d 57

The STATE, Respondent

v.

Christopher F. DAVIS, Petitioner.

No. 26229.

Supreme Court of South Carolina.

Heard Oct. 18, 2006.

Decided Nov. 20, 2006.

Chief Attorney Joseph L. Savitz, III, of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, and Assistant Deputy Attorney General Donald J. Zelenka, of Columbia, and Solicitor Barbara R. Morgan, of Aiken, for Respondent.

Justice WALLER:

We granted petitioner's request for a writ of certiorari to review the Court of Appeals' decision in *State v. Davis*, 364 S.C. 364, 613 S.E.2d 760 (Ct.App.2005). We vacate in part, reverse, and remand for a new trial.

## FACTS

A jury convicted petitioner, Christopher F. Davis, of murder and armed robbery. The victim was Paul Williams ("Paul"). On direct appeal, petitioner argued that the trial court erred by allowing Shawn Hicks, the State's key witness, to testify to statements made by Greg Hill. The Court of Appeals affirmed, finding that: (1) the statements made by Hill were non-testimonial in nature, and therefore, pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), there was no Confrontation Clause violation; (2) the statements fit within the excited utterance exception of the hearsay rule; and (3) even if erroneously admitted, any error was harmless.

In the early morning hours of April 18, 2000, Hicks was selling crack cocaine near Paul's house in Aiken. Hicks testified that he heard petitioner, Reggie Stevens, and Paul arguing. Hicks then heard a gunshot and saw three individuals running through the victim's backyard. Hicks identified Stevens as one of the men because he stumbled and fell, but Hicks could not identify the other two. After hearing the gunshot, Hicks sold $70 worth of crack to Stevens and Hill. Hicks stated he normally sold drugs to Stevens, but that $70 was an unusually large purchase. Hicks testified that he believed Stevens and Hill then went to a nearby abandoned house to smoke the crack and returned shortly thereafter with petitioner.[1] Petitioner had a shotgun in a black bag and a bag of coins. According to Hicks, petitioner bought about $30 worth of crack from Hicks with the coins.

Additionally, Hicks testified that petitioner offered to sell him the shotgun. The following colloquy occurred at trial:

---

[1]. Hicks estimated his times during his testimony. He stated that he saw petitioner "about 5 to 10 minutes" after the gunshot. Therefore, according to Hicks, in five or ten minutes, he sold Stevens and Hill crack, they left to smoke the crack, and then returned with petitioner.

Q. What, if anything, did anybody say to you to prevent you from buying [the shotgun]?

A. Well, he told me not to purchase the shotgun.

Q. Who told you?

A. Greg Hill.

Although petitioner objected to the admission of Hill's statement through Hicks on the ground he could not cross-examine Hill, the trial court ruled the statement admissible as a statement by a co-conspirator. Later in his direct examination, Hicks again testified to Hill's statement, as follows:

Q. [W]hat did Greg Hill tell you that night . . . ?

A. [Petitioner] and Reggie [Stevens] went in the house.

Q. All right. Did he say anything about Paul being shot or anything?

A. Yeah. That's why he told me not to get the shotgun.

Q. Because?

A. Paul had been shot with it.

Hicks first told police about this incident when he was in jail at the Aiken County Detention Center on unrelated charges of strong armed robbery and drug distribution. Petitioner and Hill were also in the detention center while Hicks was there. Hicks testified that he and petitioner would write notes to each other while in jail. The State admitted a note signed and dated by petitioner, but written in Hicks' handwriting. Hicks read the note to the jury as follows:

Hey Chris the night that ya'll [sic] came and tried to sell me the shotgun, ya'll was [sic] coming from Paul's house and what I need to know from you who was the trigger man? I know it wasn't Greg from what he told me that night, so it had to be you or Reggie. You got the gun and Greg told you and Reggie who the one who went in the house, so who pulled the trigger? If Reggie did it you should write Reggie's name or if you did it, just sign your name at the bottom and I'll help you out by writing that letter. Just write what you want me to tell them.

The letter is signed "Christopher Davis" and dated "3–15–01." [2]

Hicks' brother, Raymond "Ike" Hicks, also testified. Like his brother, Ike was out selling drugs the night of the shooting. Ike stated that he heard "a little arguing and stuff" from Paul's house and then a gunshot. "A few minutes later, about 10, 15—no, it was about 5 or 10 minutes later," he saw a few people running from Paul's house. About 10 to 20 minutes after the gunshot, Ike saw Stevens and Hill, and also saw petitioner talking to his brother. Ike saw that petitioner had a gun in a bag and was asking Hicks if he wanted to buy it. Ike further stated that Stevens had "change and money" and bought about $100 of crack cocaine from him in the time after Ike heard the gunshot.

Marcus White testified that petitioner came to his house late one night with a gun asking if he could keep it at White's house. White gave petitioner "some Clorox because he said he bought it from [Stevens] and he didn't want his prints on it." White further stated that petitioner then "took the gun in the back and hid it." He never saw petitioner come back and get the gun.

Another State witness, Calvin Marcel Patten, testified that he was "[h]anging out, selling dope" on the night Paul was killed. Patten stated that he heard a gunshot between one and two a.m. and saw three people run from behind Paul's house. According to Patten, Stevens tripped over the fence while running from the house. About 15 to 30 minutes after Patten heard the gunshot, he saw petitioner.

On cross-examination, Patten also testified that he spoke and exchanged notes with petitioner while they were both in jail. In one written exchange, when asked by petitioner if he had been promised anything, Patten replied that he was not promised anything, "but was told that I could help myself with the case by helping them with" petitioner.[3] From the same note, Patten read the following:

---

2. The State presented a handwriting expert who examined the note and opined that the signature and 3–15–01 were both in petitioner's handwriting.

3. After reading this part of the note, Patten explained as follows: "So basically I was told that the cases pending against me was [sic] not to worry about it because I was helping them."

"Yes, I talked to Shawn Hicks. Some of the things he wanted me to say on the stand when we were scheduled to come to court, I couldn't say because it was a lie and I didn't see [petitioner] with a gun. Some of the things he wanted me to say was that I seen [petitioner] come through the fence and also he wanted me [to] say that I seen [petitioner] with a gun and that he shot Paul."

Patten further testified that he saw Stevens with a pocket full of change, but he did not see a shotgun that night.

In Paul's house, the police found the butt of a shotgun that had been wrapped in black electrical tape. Coins were on the floor. In front of Paul's house, a footprint was found in the dirt and a plaster cast was made by police; later in the investigation, the shoe print was matched to Stevens' Nike tennis shoes.

At some point, petitioner, Stevens and Hill were all arrested for Paul's murder.[4] Stevens told police he sold petitioner the shotgun. Petitioner eventually admitted to police that he had bought the gun from Stevens, but he had thrown if off the side of a cliff. The police, however, did not find the gun.

In his own defense, petitioner testified to the following. On the night of the crime, he could not remember exactly where he was; he told the jury he was "about 19, a teenager, just having fun and all" and that he sold drugs at night. He bought the gun from Stevens although he could not remember exactly when. Petitioner stated that he gave Stevens $20 worth of crack for the gun which had a broken stock. Petitioner decided the gun was not worth much, so he left it on the grass. However, after the police told him they believed the gun had been used to murder Paul, petitioner saw Stevens who, according to petitioner, now wanted the gun back. Petitioner testified that he thought Stevens "done did [sic] something" with the gun related to the murder, so petitioner wanted to get rid of the gun. He threw the gun in the back of White's house; then he wiped the gun down with Clorox and "threw it off the cliff."

Petitioner further testified that while he and Hicks were in jail, Hicks had promised petitioner that he (Hicks) would write

---

4. Petitioner was not tried with either of his co-defendants.

a statement telling authorities that police had forced him to falsely accuse petitioner. Petitioner explained that he signed his name to a blank piece of paper and only later discovered that the "confession" had been written in pencil above his signature. Petitioner denied killing Paul.

Byron Mathis, who was in jail with petitioner, testified that he remembered Hicks and petitioner exchanging notes in jail. Mathis stated that he saw petitioner sign a blank piece of paper and slid it back to Hicks. Mathis testified he told petitioner "he was a fool" to sign a blank piece of paper.

The jury convicted petitioner, and the trial court sentenced him to life without parole for murder, and 30 years consecutive for the armed robbery.[5] The Court of Appeals affirmed. *Davis, supra.*

## ISSUE

Did the Court of Appeals err in affirming the trial court's admission of the hearsay statement made by Hill?

## DISCUSSION

Petitioner argues the statement made by Hill to Hicks that the shotgun had been used to murder Paul was erroneously admitted hearsay. Petitioner further contends the error was not harmless. We agree.

### *Non–Testimonial Statement*

In its opinion below, the Court of Appeals devoted an extended discussion to the United States Supreme Court's 2004 decision in *Crawford v. Washington.* The Court of Appeals explored the *Crawford* decision in depth including a discussion of scholarly articles written in the wake of *Crawford.* In addition, the Court of Appeals analyzed **numerous** cases analyzing the impact of *Crawford* on such statements as those made: (1) during 911 calls, (2) during police investigations, (3) by children, and (4) to family, friends, or acquaintances. *State v. Davis,* 364 S.C. at 373–401, 613 S.E.2d at 765–80. Ultimately, the Court of Appeals determined that

---

**5.** Petitioner was also convicted of possession of a weapon during the commission of a violent offense, but the trial court imposed no sentence for this third offense.

Hill's statement to Hicks was non-testimonial, and therefore the rule of *Crawford* did not apply. Given the fact that Hill's statement to Hicks clearly was made outside of an investigatory or judicial context, we agree the statement is non-testimonial. However, because the overwhelming majority of the Court of Appeals' *Crawford* discussion does not relate to the precise issue in the instant case, we vacate that portion of the opinion.

### Excited Utterance Exception to Hearsay Rule

The Court of Appeals analyzed the hearsay issue pursuant to the rule of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). This rule allows admission of a hearsay statement if it falls within a "firmly rooted hearsay exception." Noting that the State conceded the trial court had erred by admitting the statement as a statement by a co-conspirator,[6] the Court of Appeals nevertheless agreed with the State's argument that the admission of Hill's statement should be upheld under the excited utterance exception.[7] *Davis*, 364 S.C. at 402, 613 S.E.2d at 780. Petitioner maintains this was error, and we agree.

An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" and may be admitted at trial as an exception to the hearsay rule. Rule 803(2), SCRE. The rationale underlying the excited utterance exception is that "the startling event suspends the declarant's process of reflective thought, reducing the likelihood of fabrication." *State v. Dennis*, 337 S.C. 275, 284, 523 S.E.2d 173, 177 (1999).

A court must consider the totality of the circumstances when determining whether a statement falls within the excited utterance exception. *Id.* Nonetheless, "the burden of

---

6. *See* Rule 801(d)(2)(E) (a statement is not hearsay if it is admitted against a party and was made by a coconspirator of the party during the course and in furtherance of the conspiracy). Although petitioner, Stevens, and Hill were all indicted for Paul's murder, there was no allegation or evidence of a conspiracy.

7. The Court of Appeals addressed this argument pursuant to Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal").

establishing the facts which qualify a statement as an excited utterance rests with the proponent of the evidence." 31A C.J.S. *Evidence* § 359 (1996); *accord Mariano v. State*, 933 So.2d 111, 118 (Fla.Dist.Ct.App.2006); *Jarvis v. Commonwealth*, 960 S.W.2d 466 (Ky.1998); *State v. Kemp*, 919 S.W.2d 278, 280 (Mo.Ct.App.1996) ("The party offering the statement as an exception to the rule against hearsay has the burden of making a sufficient showing of spontaneity to render the statement admissible."). Finally, statements which are not based on firsthand information, such as where the declarant was not an actual witness to the event, are not admissible under the excited utterance exception to the hearsay rule. *State v. Hill*, 331 S.C. 94, 99, 501 S.E.2d 122, 125 (1998).

█ As applied to the instant case, we find there simply is insufficient evidence that Hill's statement is an excited utterance. The Court of Appeals relied heavily on the fact that "murder is certainly a startling event." *Davis*, 364 S.C. at 404, 613 S.E.2d at 781. In our opinion, however, relying on the fact that there was a murder, or that the statement was about the weapon used to commit the murder, is inadequate to establish excited utterance.

In *Dennis*, also a murder case, we found a hearsay statement properly admitted as an excited utterance. There, the State elicited the following testimony:

Q. When you saw—I'm going to call him Moses Otis Dennis—when you saw Moses Otis Dennis, that was real shortly after the shooting, wasn't it?

A. Yes, sir.

Q. You all were still all excited and everything, weren't you?

A. Yes, sir.

Q. And [Otis] told you that his brother had shot [the victim] because [the victim] had taken a swing at his brother?

A. Uh huh.

Q. He said that, didn't he?

A. Yes, sir.

337 S.C. at 283, 523 S.E.2d at 176–77. This Court character-ized Otis's statement as an excited utterance explaining that Otis, a co-defendant, "allegedly had just seen his brother shoot an unarmed man, abruptly ending a fistfight. [The witness] testified Otis made the statement to him when he saw Otis one to two minutes after the shooting, tucking a gun beneath his shirt as he walked between apartment buildings." *Id.* at 284, 523 S.E.2d at 177. Therefore, we held that the statement fell within a firmly rooted exception to the hearsay rule and did not violate the Confrontation Clause. *Id.* at 288, 523 S.E.2d at 179.

Although the instant case is somewhat similar to the facts in *Dennis,* the cases are distinguishable. First, no evidence was elicited by the State that Hill was still under the stress or excitement of Paul's shooting. Therefore, the State did not meet its burden of establishing a foundation for the excited utterance. *See Mariano v. State, supra; Jarvis v. Common-wealth, supra; State v. Kemp, supra; see also* 31A C.J.S. *Evidence* § 359 (1996) ("the burden of establishing the facts which qualify a statement as an excited utterance rests with the proponent of the evidence").

Second, the evidence in the record does not support the conclusion that Hill witnessed the shooting. According to Hicks, Hill stated that Stevens and petitioner had gone into Paul's house. No one testified that Hill was in the house at the time of the shooting, and Hill's statement about the gun being used to shoot Paul does not establish he witnessed the murder.[8] Because there is no evidence Hill actually saw Paul get shot, Hill's statement is not admissible under the excited utterance exception to the hearsay rule.[9] *State v. Hill, supra.*

---

8. In contrast, the Court of Appeals found the evidence supported "the inference" that Hill was present at the murder scene and had **firsthand** knowledge the shotgun had been used to kill Paul. *Davis,* 364 S.C. at 405, 613 S.E.2d at 782. The Court of Appeals' analysis, however, does not take into account Hicks' specific testimony that Hill said only Stevens and petitioner went into the house. The "jailhouse confession" note also reinforces that Hill told Hicks only Stevens and petitioner went into Paul's house. We therefore reject the Court of Appeals' conclusion that the evidence supports the inference Hill witnessed the shooting.

9. Furthermore, because there is insufficient evidence Hill witnessed the shooting, the State's alternate argument that his statement was properly

Consequently, we hold Hill's statement does not fall within the excited utterance exception to the rule against hearsay. Accordingly, we reverse the Court of Appeals' ruling the statement was admissible.

### Harmless Error

■ The Court of Appeals also concluded that any error was harmless. Petitioner argues, however, that because of the abysmal credibility of Hicks, the admission of Hill's statement through Hicks could not be harmless. In addition, petitioner points out that another State witness, Patten, testified that Hicks had asked him to testify falsely against petitioner. Given the highly circumstantial nature of the State's case, as well as the credibility problems of all the main witnesses, we agree with petitioner that the error was not harmless.[10]

■ A violation of a defendant's Sixth Amendment right to confront the witness is not *per se* reversible error; instead, this Court must determine whether the error was harmless beyond a reasonable doubt. *State v. Graham*, 314 S.C. 383, 386, 444 S.E.2d 525, 527 (1994); *see also State v. Mitchell*, 286 S.C. 572, 336 S.E.2d 150 (1985) (erroneous admission of hearsay evidence subject to harmless error analysis). Moreover, whether an error is harmless depends on the particular circumstances of the case. *State v. Mitchell*, 286 S.C. at 573, 336 S.E.2d at 151. Error is only harmless "when it 'could not

---

admitted under the present sense impression exception is without merit. *See* Rule 803(1), SCRE (defining present sense impression as a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.").

**10.** We note the State contends certiorari was improvidently granted because petitioner failed to **separately** challenge the Court of Appeals' harmless error analysis. We disagree. Petitioner maintained in the petition for rehearing to the Court of Appeals, as well as in the petition for a writ of certiorari, that the error by the trial court was not harmless. The argument is also made in petitioner's brief to this Court. The Appellate Court Rule regarding certiorari to the Court of Appeals states that "[a] question presented will be deemed to include every subsidiary question fairly comprised therein." Rule 226(d)(2), SCACR. Because petitioner specifically raised a question regarding the admission of hearsay, a harmless error argument is "a subsidiary question fairly comprised" within that issue.

reasonably have affected the result of the trial.' " *Id.* (citation omitted).

We find the hearsay evidence admitted in the instant case almost certainly affected the result of the trial and therefore could not be harmless. Hill's statement to Hicks was a crucial piece of evidence linking petitioner both to the scene of the crime and the murder weapon. The scant physical evidence in this case includes a shoeprint which connected Stevens—not petitioner—to the scene. Stevens was also the only person witnesses positively identified running from the scene. Moreover, there are significant credibility problems with the fact witnesses (including petitioner). All were involved with crack cocaine on the night in question and did not initially give informative statements to the authorities. Often, cooperation with police on this investigation came only after several witnesses had been jailed on other charges and were facing prison time themselves. In sum, because the hearsay statement was made by petitioner's co-defendant, the case involved mostly circumstantial evidence, and the dismal credibility of many of the witnesses, we hold the erroneous admission of Hill's statement through Hicks was not harmless.

Accordingly, we reverse the Court of Appeals' finding of harmless error and remand to the trial court for a new trial.

### CONCLUSION

In sum, we vacate the portion of the Court of Appeals' opinion discussing *Crawford v. Washington. See State v. Davis,* 364 S.C. at 373–401, 613 S.E.2d at 765–80. Additionally, we reverse the ruling that Hill's statement to Hicks was admissible as an excited utterance exception to the hearsay rule. We also reverse the finding that any error by the trial court admitting the statement was harmless. The Court of Appeals' decision is therefore

**VACATED IN PART; REVERSED; AND REMANDED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.