KONDUROS, J.:
**443 Justin Jermaine Johnson appeals his convictions for two counts of murder, kidnapping, burglary in the first degree, and possession of a firearm during the commission of a violent crime. He maintains the circuit court erred in (1) admitting predeath photographs of the victims, (2) permitting a witness to testify via Skype, (3) admitting his confession to police when it was not voluntarily given, (4) denying his motion for mistrial when he was brought shackled and guarded into a holding room adjacent to the jury pool's location, (5) denying his motion for mistrial when two witnesses involved in the case discussed the merits of the case in the hallway outside the courtroom and within earshot of prospective jurors, and (6) sentencing him to five years for possession of a weapon during the commission of a violent crime when a statute prohibits such punishment. We affirm.
FACTS
Johnson had two minor children with Kaisha Caraway, a nine-month-old son (Son) and a two-year-old daughter (Daughter). Kaisha and the children lived with her grandparents, John and Maxine Caraway. Son and Maxine Caraway were shot and killed on April 6, 2011. Johnson was arrested and indicted for the crimes.
At Johnson's trial, Kaisha testified that prior to the morning of the murders, she and Johnson had not been romantically involved for nine months. However, the two stayed in contact, and Johnson had his G.I. Bill check deposited into her bank account, on which he was a secondary cardholder, to help support the children. Kaisha and Johnson argued the night **444 before the murders regarding Kaisha's having changed the personal identification number (PIN) on this account.
According to Kaisha, Johnson arrived at the Caraway residence on the morning of April 6, 2011, to take Son and Daughter to a doctor's appointment. Although he and Kaisha had discussed this, Kaisha was not expecting Johnson as he had last indicated he would not take the children. The two argued about the PIN over their cell phones for approximately twenty minutes until Johnson's phone battery died. He then left with Son and Daughter to go to the doctor. Kaisha testified that after Johnson had been gone about thirty minutes, she remembered something she needed to tell the doctor and phoned the doctor's office. According to the office, Johnson never arrived. Johnson returned to the Caraway residence with the children. He took Daughter out of her carseat and she walked into the house. Johnson brought Son onto the porch or into the house *742 in his carseat. Kaisha and Johnson continued arguing. According to Kaisha, Johnson got in his car to leave but as she was shutting the door to the house, he got out of the car, ran back to the house, pushed through the front door, and began punching her. Son was sitting in his high chair at this point, and Daughter was sitting in a chair in the same room. Maxine came out to see what was going on, and Johnson attacked her. When Kaisha went to get her phone, Johnson "came behind [her] and began dragging [her] out of the house."
According to Kaisha, Maxine had scratches and an injured nose and ran past Kaisha and Johnson who were now on the front porch. As she did, Johnson loosened his grip on Kaisha enough for her to slip out of her shirt and away from him into the house. Daughter was also outside the house.
Kaisha testified she located Maxine's cell phone and ran toward the hall when she realized Son was still in his high chair. Johnson entered the house with a shotgun in his hand and pointed it at her saying "you made me do this." She closed her eyes and heard a gunshot. She then realized Son had been shot. Kaisha ran down the hallway, locked herself in the bathroom, and pushed a cabinet in front of the door. She called 911 using the cell phone, and then Johnson shot through **445 the door. Kaisha told Johnson emergency services were on the way.
Kaisha testified she left the bathroom and she and Johnson moved into the living room. When 911 called back, Johnson told Kaisha to tell the operator the call was a mistake, to pretend to be her grandmother, and to give them the name "Robert." After a few minutes, she heard Daughter crying and Johnson went to get her. As Kaisha went to the door, she saw that Maxine had been shot. Kaisha, Johnson, and Daughter got into his car to go to the police station. Though Johnson had the shotgun with him at first, he removed the remaining shells and left the gun in the yard at Kaisha's suggestion.
According to Kaisha, as they were driving to the police station, she and Johnson discussed the details of the story they would tell the police. Before they arrived, they encountered a police officer and led the officer back to the Caraway residence. Other police officers eventually arrived, and once Kaisha was separated from Johnson, she wrote "he did it" on a piece of paper, referring to Johnson.
Johnson's statement to police was initially in sharp contrast to Kaisha's testimony. After being read his Miranda[1] rights, he told police he arrived at the Caraway residence to find Kaisha and her boyfriend "Robert" arguing and the only shot he fired was at Robert in defense of himself and the others present at the house. However, after a lengthy interrogation, Johnson admitted Robert did not exist and he had fired the gun-although the gun "just went off" and it was an accident.
Prior to the selection of the jury, Johnson moved for a mistrial based on having been brought into the courthouse handcuffed and accompanied by jail personnel. He argued jurors may have seen him and been prejudiced by the indicia of guilt. The circuit court denied the motion.
Johnson made an additional mistrial motion based on his attorney having overheard two witnesses for the State discussing evidence in the case within proximity of potential jurors in the courthouse hallway. The circuit court asked the jury pool whether they had heard anything that would influence their **446 ability to be impartial and followed that with the question whether they had heard anything "today." All jurors responded in the negative. The circuit court denied the mistrial motion.
Also prior to trial, the circuit court held a Jackson v. Denno[2] hearing to determine the voluntariness of Johnson's statement to police. Investigator Mason Moore, testifying via Skype,[3] and Investigator Kippton Coker stated they advised Johnson of his Miranda rights and they did not threaten Johnson in *743 order to coerce a confession from him. Investigator Moore further testified Johnson requested to speak with him again the following day and he was again read his Miranda rights. Moore stated Johnson did not recant his testimony or reassert his claim that the crimes were committed by a third party. After viewing the video recording that captured the majority of the interrogation, the circuit court found the statement was voluntary.
[T]he statement made by Mr. Johnson was given freely, voluntarily, knowingly, and intelligently. Although it was over an eleven-hour period, he was-he was Mirandized twice during that. He was very talkative.
He was offered ample times to take breaks. He was offered food. He was offered drink. He certainly did not appear to be under excessive I guess oppression in the giving of the confession, and I am going to allow the confession to come into evidence.
Although Johnson had not objected to Investigator Moore, who had moved to Montana, testifying via Skype for the Jackson v. Denno hearing, Johnson did object to the video testimony at trial. In anticipation of such an objection, the court made a preliminary ruling to admit the video testimony because the witness was 2,500 miles away, was an "ancillary" witness, "everything that was going on with him is available on videotape," and another officer was in the room for the majority of the interrogation.
**447 Johnson argued the Skype testimony violated the Confrontation Clause of the Sixth Amendment and mere convenience of the witness should not trump the defendant's right to face-to-face confrontation. The State countered by reiterating the statements of the court and adding "a compelling or a substantial need exists to avoid costs, to avoid inconvenience to the witness, and to pretty much put on the record something that is not substantive but is a matter of tying the chain together." The circuit court concluded the Skype testimony was admissible.
The circuit court also held a preliminary hearing to address the admission of photographs at trial. Johnson objected to the admission of a predeath photograph of Maxine, arguing it was irrelevant and served only to arouse the sympathy of the jury. He further argued the photograph was more prejudicial than probative. Additionally, Johnson objected to the admission of a predeath picture of Son. The circuit court admitted the photographs saying, "I think who the person was is a part of this case." Johnson renewed his objections when the photographs were introduced, and the circuit court denied the objections.
The jury convicted Johnson for two counts of murder, kidnapping, burglary in the first degree, and possession of a firearm during the commission of a violent crime. The circuit court sentenced him to life in prison without parole plus five years for the possession of a weapon during the commission of a violent crime. This appeal followed.
LAW/ANALYSIS
I. Admission of Predeath Photographs
Johnson argues the circuit court erred in admitting predeath photographs of Maxine and Son. We agree, but we conclude the admission of the photographs constitutes harmless error in this case.
"The relevancy, materiality, and admissibility of photographs as evidence are matters left to the sound discretion of the trial court." State v. Johnson , 338 S.C. 114, 122, 525 S.E.2d 519, 523 (2000). "However, photographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or unnecessary to the issues at **448 trial." Id ."Yet, there is no abuse of discretion if the offered photograph serves to corroborate testimony." Id .
" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Even if the evidence was not relevant and thus wrongly admitted by the trial judge, its admission may constitute harmless error if the irrelevant evidence did not affect the outcome of *744 the trial." State v. Langley , 334 S.C. 643, 647, 515 S.E.2d 98, 100 (1999).
In Langley , our supreme court reversed the circuit court's admission of a photograph of the victim in his high school band uniform because it was not relevant to proving the guilt of the defendant. Id . at 648, 515 S.E.2d at 100. The court concluded the identity of the victim was not at issue and the only possible purpose of the photograph was to distance the victim from the drug dealing involved in the case. Id. at 648 n.3, 515 S.E.2d at 100 n.3.
As in Langley , the identification of the victims was not at issue in this case and nothing in the photographs served to make any fact in issue more or less likely. Neither the State nor the circuit court offered any rationale for how the predeath photographs were relevant to establishing Johnson's guilt. Consequently, we conclude admitting the photographs was error.
Nevertheless, we find the error was harmless based on the overwhelming evidence of guilt in the case and the nature of the error. Johnson's statement and Kaisha's testimony indicate Johnson was the shooter. The physical evidence in the case corroborated Kaisha's testimony. Additionally, the jury knew the victims were a nine-month-old child and his great-grandmother, so feelings of sympathy were already on the side of the victims based on their status. Overall, we conclude the introduction of the photographs could not have reasonably affected the outcome of the trial. See State v. Chavis , 412 S.C. 101, 115, 771 S.E.2d 336, 343 (2015) ("Error is harmless when it could not reasonably have affected the result of the trial.").
**449 II. Skype Testimony
Johnson next maintains the circuit court erred in permitting Investigator Moore to testify via Skype in violation of the Confrontation Clause of the Sixth Amendment. We agree. However, we again conclude this constituted harmless error under the facts of this case.
"A trial court's decision to allow videotaped or closed-circuit testimony is reversible 'only if it is shown that the trial judge abused his discretion in making such a decision. ...' " State v. Bray , 342 S.C. 23, 27, 535 S.E.2d 636, 639 (2000) (quoting State v. Murrell , 302 S.C. 77, 82, 393 S.E.2d 919, 922 (1990) ). "Where there is evidence to support a trial court's ruling, it will not be overturned for an abuse of discretion." Bray , 342 S.C. at 27, 535 S.E.2d at 639.
The majority of courts that have addressed two-way closed circuit testimony have adopted the same test set forth in Maryland v. Craig , 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), which addressed the use of one-way video testimony in the context of a child sexual assault case.[4] In Craig , the United States Supreme Court recognized the right to face-to-face confrontation under the Sixth Amendment is not absolute, but that it may only be modified "where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Id . at 850, 110 S.Ct. 3157.
The Second Circuit Court of Appeals has adopted a less stringent standard for permitting two-way closed circuit testimony. In United States v. Gigante , 166 F.3d 75, 78 (2d Cir. 1999), the Second Circuit affirmed the use of two-way video testimony when the witness was in the Federal Witness Protection Program and suffering from terminal cancer.
**450 Id . at 79. The court did not adopt the Craig test, emphasizing that in two-way testimony the witness must view the defendant-a closer approximation to face-to-face confrontation. Id . at 80-81. Instead, the court determined two-way video should be permitted in the same circumstances warranting a deposition under Rule 15 of the Federal Rules of Criminal Procedure. The court held *745 that "[u]pon a finding of exceptional circumstances, ... a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." Id . at 81. The court concluded the witness's situation coupled with Gigante's own poor health, which limited his ability to travel for a deposition, constituted exceptional circumstances. Id . Even having adopted a less stringent test than that set forth in Craig , the court opined "[c]losed-circuit television should not be considered a commonplace substitute for in-court testimony by a witness." Id .[5]
In United States v. Yates , 438 F.3d 1307 (11th Cir. 2006), the Eleventh Circuit held witnesses' trial testimony via two-way video conference violated the defendant's Sixth Amendment rights. Id . at 1312. Two essential witnesses were in Australia beyond the subpoena power of the United States government but willing to testify remotely. Id . at 1310. On appeal, the State argued two-way video conferencing provided all the same Sixth Amendment protections as face-to-face confrontation and two-way video conferencing was a better protection of rights than depositions when the witness was unavailable for trial. Id . at 1312. The appellate court determined Craig presented the proper test for its analysis, and the video conference testimony violated Yates' Sixth Amendment rights because it did not further an important public policy. Id . at 1313, 1316.
The district court made no case-specific findings of fact that would support a conclusion that this case is different from any other criminal prosecution in which the Government would find it convenient to present testimony by two-way **451 video conference. All criminal prosecutions include at least some evidence crucial to the Government's case, and there is no doubt that many criminal cases could be more expeditiously resolved were it unnecessary for witnesses to appear at trial. If we were to approve introduction of testimony in this manner, on this record, every prosecutor wishing to present testimony from a witness overseas would argue that providing crucial prosecution evidence and resolving the case expeditiously are important public policies that support the admission of testimony by two-way video conference.
Id . at 1316.
The Fourth Circuit has likewise acknowledged the Craig test is the measure for considering whether two-way closed circuit testimony is permissible under the Confrontation Clause. United States v. Abu Ali , 528 F.3d 210, 240 (4th Cir. 2008). In Abu Ali , the court affirmed the admission of testimony of Saudi Arabian officials beyond the reach of American courts in prosecution of a terrorism suspect. Id . at 240-41. The court found the interest of national security and protecting Americans from unprovoked terrorist attacks satisfied the first prong of Craig . Id . However, the court clarified:
This is not to suggest that a generalized interest in law enforcement is sufficient to satisfy the first prong of Craig . Craig plainly requires a public interest more substantial than convicting someone of a criminal offense. The prosecution of those bent on inflicting mass civilian casualties or assassinating high public officials is, however, just the kind of important public interest contemplated by the Craig decision.
Id . at 241.
The court further determined the trial court had taken steps necessary to ensure the reliability of the testimony so that no Sixth Amendment violation occurred. Id . at 241-42.
Additionally, in 2002, the United States Supreme Court declined to adopt a proposed Federal Rule of Evidence that mirrored the Gigante approach. The proposed amendment stated:
In the interest of justice, the court may authorize contemporaneous, two-way video presentation in open court of testimony from a witness who is at a different location if:
*746 **452 (1) the requesting party establishes exceptional circumstances for such transmission;
(2) appropriate safeguards for the transmission are used; and
(3) the witness is unavailable within the meaning of Federal Rule of Evidence 804(a)(4)-(5)
Hadley Perry, Virtually Face-to-Face: The Confrontation Clause and the Use of Two-Way Video Testimony , 13 Roger Williams U. L. Rev. 565, 566-67 (2008).
South Carolina has not specifically addressed the tension between two-way video testimony and a defendant's rights under the Confrontation Clause. However, South Carolina has recognized modifications to the traditional presentation of testimony may be appropriate in certain situations involving vulnerable witnesses. See S.C. Code Ann. § 16-3-1550(E) (2015) ("The circuit or family court must treat sensitively witnesses who are very young, elderly, handicapped, or who have special needs by using closed or taped sessions when appropriate."). Our state has adopted the Craig test in cases of one-way closed-circuit testimony and the testimony of children in sexual assault cases. See State v. Lewis , 324 S.C. 539, 544-45, 478 S.E.2d 861, 864 (Ct. App. 1996) (citing the Craig test for analyzing whether a witness's testimony via one-way closed circuit television violated the defendant's Sixth Amendment rights). While our courts have generally noted the protection of children is an important public policy concern, the appellate courts have not adopted a generalized policy of permitting child victims to present testimony via video recording. Rather, the courts require a specific case-by-case finding that a child witness will be traumatized by testifying in front of the defendant. See Lewis , 324 S.C. at 547-49, 478 S.E.2d at 865-67 (finding a Confrontation Clause violation when trial court permitted video testimony of a particular child without specific evidentiary support the child would be traumatized by testifying in the defendant's presence); State v. Murrell , 302 S.C. 77, 80, 393 S.E.2d 919, 921 (1990) (holding a trial judge must make a case-specific determination of the need for videotaped testimony in a child sexual assault case). This approach underscores the reluctance of the court to use **453 methods other than live testimony except under extreme circumstances.
After examining federal and state jurisprudence, we conclude the circuit court erred in permitting the State to present Investigator Moore's testimony via Skype. The Fourth Circuit has indicated the generalized conviction of criminal offenses is not sufficient to dispense with in-court confrontation and other courts have generally permitted such testimony only in cases in which the witness's health prevents him or her from traveling or possibly when a witness is beyond the subpoena power of the court. We recognize the advancements in technology permit two-way closed circuit testimony to more closely approximate face-to-face confrontation. However, in the absence of an important public policy or at least an exceptional circumstance, modifying a defendant's truest exercise of the Sixth Amendment right via in-person confrontation is inappropriate.[6]
Nevertheless, we find the circuit court's error in allowing the testimony was harmless. "[V]iolation of a defendant's Sixth Amendment right to confront the witness is not per se reversible error; instead, this Court must determine whether the error was harmless beyond a reasonable doubt." State v. Davis , 371 S.C. 170, 181, 638 S.E.2d 57, 63 (2006). "[W]hether an error is harmless depends on the particular circumstances of the case." Id . Error is harmless if it could not have reasonably affected the result of the trial. Id . at 181-82, 638 S.E.2d at 63.
We are cognizant that Johnson's confession was an important piece of evidence in this case. Likewise, we recognize the admission of his confession turned on a finding of voluntariness that must be proven by the State through its witnesses and evidence. In this *747 case, Investigator Coker's testimony plus the recordings of Johnson's interrogation met this burden. Investigator Moore's testimony was only relevant to **454 events not presented by the videos or covered by Investigator Coker. Johnson does not allege wrongdoing by Investigator Moore other than through conduct contained in the videos.[7] Consequently, Investigator Moore's testimony was largely cumulative to what was already before the jury. See State v. Haselden , 353 S.C. 190, 197, 577 S.E.2d 445, 448-49 (2003) (recognizing admission of improper evidence is harmless where the evidence is merely cumulative to other evidence). Accordingly, because the circuit court's erroneous decision to permit Investigator Moore to testify via Skype was harmless, we affirm the admission of that testimony.
III. Voluntariness of Confession
Next, Johnson argues the circuit court erred in finding his confession was voluntary because police misrepresented the evidence to him, threatened him with the death penalty, and repeatedly referenced Daughter and what she would think of her father's actions.[8] We disagree.
"The trial judge determines the admissibility of a statement upon proof of its voluntariness by a preponderance of the evidence. If admitted, the jury must then determine whether the statement was given freely and voluntarily beyond a reasonable doubt." State v. Parker , 381 S.C. 68, 74, 671 S.E.2d 619, 622 (Ct. App. 2008) (citations omitted). "When reviewing a trial court's ruling concerning voluntariness, this [c]ourt does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence." State v. Saltz , 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001). "The trial court's factual conclusions as to the voluntariness of **455 a statement will not be disturbed on appeal unless so manifestly erroneous as to show an abuse of discretion." Id .
"A criminal defendant is deprived of due process if his conviction is founded, in whole or in part, upon an involuntary confession." State v. Pittman , 373 S.C. 527, 565, 647 S.E.2d 144, 164 (2007). This due process analysis is evaluated based on examining the totality of the circumstances. In re Tracy B. , 391 S.C. 51, 66, 704 S.E.2d 71, 78-79 (Ct. App. 2010). Relevant circumstances for the trial judge to consider include the defendant's youth, the defendant's lack of education, the failure to Mirandize, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. Pittman , 373 S.C. at 566, 647 S.E.2d at 164. "If a suspect's will is overborne and his capacity for self-determination critically impaired, use of the resulting confession offends due process." Saltz , 346 S.C. at 136, 551 S.E.2d at 252.
A. Misrepresentation of Evidence
"Misrepresentations of evidence by police, although a relevant factor, do not render an otherwise voluntary confession inadmissible." State v. Goodwin , 384 S.C. 588, 601, 683 S.E.2d 500, 507 (Ct. App. 2009). "Both this [c]ourt and the United States Supreme Court have recognized that misrepresentations of evidence by police, although a relevant factor, do not render an otherwise voluntary confession inadmissible .... The pertinent inquiry is, as always, whether the defendant's will was 'overborne.' " State v. Von Dohlen , 322 S.C. 234, 243, 471 S.E.2d 689, 695 (1996). See also State v. Myers , 359 S.C. 40, 47, 596 S.E.2d 488, 492 (2004) (holding defendant's confession voluntary and admissible after police told him his hair was *748 found clutched in victim's hand because "[e]ven if the information were untrue, it is not, alone, enough to render the confession involuntary"); State v. Register , 323 S.C. 471, 478, 476 S.E.2d 153, 158 (1996) (confession voluntary and admissible despite police misrepresentation that appellant had been seen with victim, tire and shoe impressions at the murder scene were a match, and DNA evidence established guilt); Von Dohlen at 242, 471 S.E.2d at 694 (holding defendant's will was not overborne and confession was voluntary when interrogators manufactured a composite sketch of suspect by looking at **456 defendant through a one-way mirror and showed defendant shell casings not actually recovered from the crime scene).
Investigators Coker and Moore told Johnson the trunk of his car was analyzed and only his fingerprints were found, his shoe matched a footprint left from kicking in the door, his ring matched a wound left on Kaisha, and one could hear him in the background of the 911 calls. The primary evidence repeatedly referenced by the Investigators related to the 911 calls, which they claimed made Johnson's story impossible to believe. While this information was either unconfirmed or inaccurate, courts have routinely held the misrepresentation of evidence does not render a confession involuntary unless it is demonstrated the free will of the defendant was overborne.
B. Statements Regarding the Death Penalty
A "confession may not be 'extracted by any sort of threats or violence, [o]r obtained by any direct or implied promises, however slight, [o]r by the exertion of improper influence.' " State v. Rochester , 301 S.C. 196, 200, 391 S.E.2d 244, 246 (1990) (alterations in original) (quoting Hutto v. Ross , 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1979) ). " 'Isolated incidents of police deception ... and discussions of realistic penalties for cooperative and non-cooperative [defendants] ... are normally insufficient to preclude free choice.' " State v. Parker , 381 S.C. 68, 91, 671 S.E.2d 619, 630-31 (Ct. App. 2008) (alterations in original) (quoting United States v. Mendoza-Cecelia , 963 F.2d 1467, 1475 (11th Cir. 1992) ). In State v. Childs , 299 S.C. 471, 474, 385 S.E.2d 839, 841 (1989), the court found Childs's statement to police voluntary even though Childs argued his confession was coerced because investigating officers threatened him with the electric chair.
In this case, Johnson only cites to one instance of investigators mentioning the death penalty. However, this instance was not really a "discussion" of possible penalties but a statement that keeping up this "bullshit story" was going to land him in prison for life if not the death penalty. Nevertheless, this comment was isolated, and the death penalty was a possible sentence for the crimes at issue. Johnson did not recant his "Robert" story until well after the death penalty was mentioned, and it does not appear to have overborne his will.
**457 C. Statements Regarding Daughter
In State v. Corns , 310 S.C. 546, 552, 426 S.E.2d 324, 327 (Ct. App. 1992), the court found an officer's statements that Corns's wife could be arrested because she could be "involved in the marijuana" and their children could be taken from them amounted to an exertion of improper influence rendering his confession involuntary. Other cases in which statements were found to be involuntary involved the threat of specific tangible consequences to the defendant. See State v. Osborne , 301 S.C. 363, 366-67, 392 S.E.2d 178, 179-80 (1990) (holding defendant's statement inadmissible when over a period of months involving multiple interrogations, defendant was told she would be charged with the additional crime of withholding evidence if she remained silent); State v. Hook , 348 S.C. 401, 413-14, 559 S.E.2d 856, 862 (Ct. App. 2001) (holding defendant's statement to his probation officer was inadmissible because circumstances of interrogation indicated defendant's probation would be revoked if he did not cooperate).
Few criminals feel impelled to confess to the police purely of their own accord without any questioning at all. ... Thus, it can almost always be said that the interrogation caused the confession. ... It is generally recognized that the police may use *749 some psychological tactics in eliciting a statement from a suspect. ...
These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.
Von Dohlen , 322 S.C. at 244, 471 S.E.2d at 695 (quoting Miller v. Fenton , 796 F.2d 598, 604-05 (3d Cir. 1986) ).
Johnson argues statements that Daughter would think he was a cold-blooded killer who only survived because her father ran out of bullets was unduly coercive. However, these statements are not the type of tangible threat related to children or family members generally considered to render a confession involuntary. Such statements are more akin to a psychological tactic than actual coercion.
Overall, we conclude the circuit court did not abuse its discretion in admitting Johnson's statement as the evidence **458 supports a finding his will was not overborne by the various tactics employed during his interrogation.
IV. Remaining Arguments
A. Shackles
The circuit court did not err in denying Johnson's motion for mistrial based on his being brought into the courthouse in handcuffs and surrounded by police personnel as the record fails to demonstrate any juror observed this activity or that any juror was prejudiced. See State v. Wiley , 387 S.C. 490, 495, 692 S.E.2d 560, 563 (Ct. App. 2010) ("The decision to grant or deny a mistrial is within the sound discretion of the trial court."); id . ("The trial court's decision will not be overturned on appeal absent an abuse of discretion amounting to an error of law."); State v. Moore , 257 S.C. 147, 152-53, 184 S.E.2d 546, 549 (1971) ("We think that when a jury or members thereof see an accused outside the courtroom in chains or handcuffs the situation is psychologically different and less likely to create prejudice in the minds of the jurors." (quoting State v. Cassel , 48 Wis.2d 619, 180 N.W.2d 607, 611 (1970) ) ); id . at 153, 184 S.E.2d at 549 (affirming the denial of defendant's motion for mistrial noting defendant presented no proof the incident prejudiced the minds of the jurors-only the allegation that it did).
B. Witness Discussion/Comments
Likewise, the circuit court did not err in denying Johnson's motion for mistrial based on his attorney having overheard two witnesses discussing the weight of the evidence when the record fails to demonstrate a juror overheard the comments or was prejudiced by them. See State v. Rowlands , 343 S.C. 454, 457-58, 539 S.E.2d 717, 719 (Ct. App. 2000) ("Whether a mistrial is manifestly necessary is a fact specific inquiry."); id . ("It is not a mechanically applied standard, but rather is a determination that must be made in the context of the specific difficulty facing the trial judge." (quoting Gilliam v. Foster , 75 F.3d 881, 895 (4th Cir. 1996) ) ); State v. Bantan , 387 S.C. 412, 417, 692 S.E.2d 201, 203-04 (Ct. App. 2010) ("The trial court should exhaust other methods to cure possible prejudice before aborting a trial.").
**459 C. Sentencing
Finally, we find Johnson's argument as to any error in his sentencing is unpreserved for appellate review. See State v. Bonner , 400 S.C. 561, 564, 735 S.E.2d 525, 526 (Ct. App. 2012) ("It is well settled that issues not raised and ruled on in the trial court will not be considered on appeal."); id . ("Thus, 'a challenge to sentencing must be raised at trial, or the issue will not be preserved for appellate review.' " (quoting State v. Johnston , 333 S.C. 459, 462, 510 S.E.2d 423, 425 (1999) ) ). While preservation concerns may be superseded by the interest of judicial economy under certain circumstances, we do not believe such circumstances are implicated in this case as the State does not concede the circuit court erred in sentencing Johnson to five years for possession of a weapon during the commission of a violent crime. See Johnston , 333 S.C. at 463, 510 S.E.2d at 425 (vacating defendant's sentence in case which "present[ed] the exceptional circumstance in which the State has conceded in its briefs and oral argument that the trial court committed error by imposing an excessive sentence");
*750 Bonner , 400 S.C. at 567, 735 S.E.2d at 528 (vacating defendant's sentence when both parties fully briefed the issue, acknowledged defendant could raise the issue in an application for post-conviction relief, and because the State "concede[d] in its brief that the trial court committed error by imposing an improper sentence.").
CONCLUSION
We find the circuit court erred in admitting predeath photographs of the victims and in permitting Investigator Moore to testify via Skype at trial over Johnson's objection. However, we conclude both of these errors were harmless under the facts of this case. Furthermore, we conclude the circuit court did not abuse its discretion in admitting Johnson's confession or in denying his motions for mistrial. Last, the sentencing issue is not preserved for our review. Therefore, Johnson's conviction is
AFFIRMED .[9]
GEATHERS, J., concurs.
SHORT, J., concurring in a separate opinion.
**460 I agree with the majority's opinion with the exception of the last issue. Johnson argues the trial judge erred in sentencing him for possession of a firearm in the commission of a violent crime because section 16-23-490(A) (2015) of the South Carolina Code of Laws prohibits such a sentence where life imprisonment without parole is imposed. I agree.
Section 16-23-490(A) states:
If a person is in possession of a firearm or visibly displays what appears to be a firearm or visibly displays a knife during the commission of a violent crime and is convicted of committing or attempting to commit a violent crime as defined in Section 16-1-60, he must be imprisoned five years, in addition to the punishment provided for the principal crime. This five-year sentence does not apply in cases where the death penalty or a life sentence without parole is imposed for the violent crime.
Section 16-23-490(A) expressly provides the mandatory five-year sentence for possession of a firearm during the commission of a violent crime shall not be imposed when the defendant is sentenced to death or to life without parole for the violent crime. Appellant was sentenced to life without parole. Although this argument was not raised to or ruled upon by the trial court, I would address the issue in the interest of judicial economy. See State v. Bonner , 400 S.C. 561, 565-67, 735 S.E.2d 525, 527-28 (Ct. App. 2012) (addressing an unpreserved sentencing issue in the interest of judicial economy); State v. Vick , 384 S.C. 189, 202, 682 S.E.2d 275, 282 (Ct. App. 2009) (noting the appellate courts have "summarily vacated" sentences for kidnapping when the defendant received a concurrent sentence under the murder statute and addressing the unpreserved sentencing issue in the interest of judicial economy). Accordingly, I would vacate Johnson's five-year sentence for possession of a firearm during the commission of a violent crime.

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

Skype is a telecommunications software that supports two-way video chat.

See United States v. Bordeaux , 400 F.3d 548, 554 (8th Cir. 2005) (" 'Confrontation' through a two-way closed-circuit television is not different enough from 'confrontation' via a one-way closed-circuit television to justify different treatment under Craig. "); Horn v. Quarterman , 508 F.3d 306, 319-20 (5th Cir. 2007) (relying on Craig and its progeny in examining whether the admission of a terminally ill witness's testimony via two-way video was contrary to clearly established federal law); United States v. Abu Ali , 528 F.3d 210, 240 (4th Cir. 2008) (discussed infra ); United States v. Yates , 438 F.3d 1307, 1312-14 (11th Cir. 2006) (en banc ) (discussed infra ).

The Sixth Circuit appears to have approved of the Gigante rationale although it has not specifically adopted the Gigante test for analyzing this issue. See United States v. Benson , 79 Fed.Appx. 813, 820-21 (6th Cir. 2003) (citing to Gigante and affirming the admission of testimony via two-way closed circuit television of an 85-year-old, out-of-state witness with numerous health issues).

We decline to adopt a specific test for the admission of two-way closed circuit testimony in this case, as convenience and expediency alone do not rise to the level of an exceptional circumstance, as set forth in Gigante , or implicate an important public policy consideration as required by Craig . Additionally, this ruling does not prohibit parties from consenting to use two-way video testimony.

Johnson's allegations as to the voluntariness of his confession are discussed more specifically in Section III of this opinion.

Johnson does not directly argue the length of his interrogation rendered his confession involuntary. Physical evidence was collected from Johnson for approximately three hours before an additional seven to eight hours of questioning by police. The interrogation began approximately mid-morning and continued through the afternoon and evening. Johnson does not appear to have been sleep deprived or otherwise physically distressed at the time of the interrogation. He was offered food, drink, and bathroom breaks and spoke with police only after having been read his Miranda rights twice.

We decide this case without oral argument pursuant to Rule 215, SCACR.