# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

James Heyward, Appellant.

Appellate Case No. 2017-001542

_____

Appeal From Richland County
R. Knox McMahon, Circuit Court Judge

_____

Opinion No. 5776
Heard February 6, 2020 – Filed October 14, 2020

_____

**AFFIRMED**

_____

Tara C. Sullivan, Jennifer Hess Thiem, and John Whitney
McGreevy, all of K&L Gates, LLP, of Charleston; and
Chief Appellate Defender Robert Michael Dudek, of
Columbia, all for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General
Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody
Jane Brown, Assistant Attorney General Susannah Rawl Cole, and
Assistant Attorney General William Joseph Maye, all of Columbia;
and Interim Solicitor, Heather Savitz Weiss, of Columbia, for
Respondent.

_____

**WILLIAMS, J.:** In this criminal appeal, James Heyward appeals his convictions
for murder, burglary in the first degree, armed robbery, two counts of kidnapping,
assault and battery in the first degree, pointing and presenting a firearm, and

possession of a weapon by a person convicted of a violent crime.  On appeal, Heyward argues the trial court erred in admitting (1) an eyewitness's out-of-court and in-court identifications of him, (2) a fingerprint card obtained from a New Jersey database and expert opinion testimony based on those fingerprints, (3) expert opinion testimony about the operational capabilities of the gun found at Heyward's residence, and (4) autopsy dissection photographs of the victim's internal head injuries.  Heyward also argues the trial court erred in allowing his alias "Abdul Muslim" to be included in the indictments and in denying his request to remove his shackles during jury selection.  Finally, Heyward argues he is entitled to a new trial due to the cumulative errors committed by the trial court. We affirm.

## FACTS/PROCEDURAL HISTORY

On October 11, 2015, authorities responded to what they believed to be a burglary in progress and found Alice Tollison (Victim) strangled to death in her home.  Her eight-year-old granddaughter (Granddaughter) was bound at her wrists and ankles.

At trial, Investigator Trisha Odom of the Richland County Sheriff's Department was qualified as an expert on latent print analysis.  She testified that after uploading fingerprints found at the crime scene (the Crime Scene Fingerprints) into a national database known as the Integrated Automated Fingerprint Identification System (AFIS), the sheriff's department received a match for those fingerprints from New Jersey.  The match linked to an FBI number, the name James Heyward, and the associated fingerprints (the N.J. Fingerprints).  Investigator Odom compared the N.J. Fingerprints to the Crime Scene Fingerprints, determined they were a match, and wrote three reports.  Heyward was subsequently arrested, and his fingerprints were taken at the jail (the Booking Fingerprints).  Investigator Odom completed subsequent reports using both the N.J. Fingerprints and the Booking Fingerprints.  Although she did not conduct a minutia comparison between the N.J. Fingerprints and the Booking Fingerprints, she conducted a pattern comparison, and she testified there was no doubt in her mind the same person made the two sets of prints.  Heyward objected to the admission of summaries of Investigator Odom's reports, arguing the initial reports used the unauthenticated N.J. Fingerprints and any analysis of later fingerprints is inadmissible because she did not indicate she compared a known standard (i.e. the Booking Fingerprints) with the N.J. Fingerprints.  The trial court found the State presented sufficient evidence to satisfy the authentication requirements and overruled Heyward's objection.

The day after Victim's murder, Granddaughter was interviewed at the Assessment and Resource Center (ARC)[1] and that interview was video recorded (the Recording). [2] Following that interview, while she was still being recorded, Investigator Joe Clarke, an investigator in the Richland County Sheriff's Department's Special Victims Unit, met with Granddaughter. Investigator Clarke showed Granddaughter a lineup, which consisted of six African American men (the Lineup), and Granddaughter selected number three, which was a picture of Heyward. Heyward was subsequently arrested and indicted.

Prior to trial, the trial court conducted a hearing pursuant to *Neil v. Biggers*[3] to determine the admissibility of Granddaughter's identification of Heyward based on the Lineup. During the *Biggers* hearing, Investigator Clarke testified the South Carolina Law Enforcement Division (SLED) prepared the Lineup using a database and when he received the Lineup, he evaluated it to ensure it was fair. He also testified as to the contents of the interview, and the trial court viewed the recording of the interview. Granddaughter testified about her identification based on the Lineup, and when asked if she picked number three because she recognized him, Granddaughter responded affirmatively. Granddaughter pointed to Heyward in the courtroom when asked if that man was in the room. The trial court found there was no undue suggestiveness in Granddaughter's identification based on the Lineup and found the Lineup and the Recording were admissible.

Prior to trial, the trial court also held a hearing on and denied Heyward's motion to strike his alias, "Abdul Muslim," from the indictments. The trial court also denied Heyward's pretrial motion to remove his ankle shackles during jury selection. The trial court agreed to reserve its ruling on a pretrial motion concerning autopsy photographs until after the testimony of Dr. Amy Durso, the State's pathologist. The photographs were admitted at trial following the in camera testimony of Dr. Durso.

At trial, Granddaughter testified she was at Victim's house when someone knocked on the door. Granddaughter later walked into the kitchen, where she found Victim and a man with a duffel bag. The man told her to sit down across the table from Victim before he put a gold rusty gun with two spots for bullets on the table. He

---

[1] ARC is a third-party entity through the Department of Mental Health that has a medical team and forensic investigators who interview children in a controlled environment without law enforcement.

[2] Granddaughter's interview at ARC was consistent with her testimony at trial.

[3] 409 U.S. 188 (1972).

demanded money from Victim, and when Victim denied having money, he put his arms around her neck and strangled her to death. The man then took Granddaughter to a closet and closed the door. When he returned and she asked him what was happening, he said Victim was sleeping. The man later took Granddaughter to a different room where he bound her hands and feet. Granddaughter struggled to get loose but eventually fell asleep, and when she woke up, the man was no longer in the home. Granddaughter was able to get to a phone and call 911. She further testified she remembered her interview at ARC and the Lineup, and she identified Heyward in the courtroom.

Mattie Canzater testified that at the time of Victim's murder, Heyward and his wife were renting two rooms in her home. She knew Heyward went by the names of Abdul and Rasheed. The Friday before the murder, she took Heyward to Victim's house to pick up tables for a yard sale, but they did not go inside. The day of Victim's murder, she did not see Heyward before church, and when she returned home after 3:00 P.M., Heyward's family was in the home, but he was not. When Heyward returned, he was carrying a large black trash bag. The next morning, she learned Victim was murdered, and she was afraid because the suspect's description matched Heyward's attire when he came home the day before. She confronted Heyward and told him Victim's gardener told the police she and Heyward had been there, the suspect's description fit him, and she knew he was not home around the time of the murder. Immediately after she confronted Heyward, he shaved his hair.

Lieutenant Kevin Isenhoward testified that during a phone call between Heyward and Heyward's wife that occurred while Heyward was incarcerated, Heyward's wife told Heyward she called CrimeStoppers and tried to blame a man named Derek for Victim's murder in an attempt to divert attention away from him. Chief Stan Smith testified a gun that matched the description given to officers by Granddaughter was found in a closet in the home where Heyward was residing. The handgun was admitted into evidence, and the State offered as an expert Investigator David Collins, a fire and tool marks examiner in the forensic sciences laboratory for the Richland County Sheriff's Department. Heyward objected to Investigator Collins as a witness, arguing Investigator Collins would be testifying as to whether or not the gun found at Heyward's residence was operational, which was irrelevant. The trial court overruled Heyward's objection.

Dr. Gray Amick, the laboratory director with the Richland County Sheriff's Department, testified Heyward's DNA was found under Victim's fingernails, on a swab of her neck, and on a swab of a draft stopper found around her neck. There was additional testimony that Heyward's fingerprints were found on the interior

side of the entry door at Victim's home, on a jewelry box, and on other items located inside the home.

The jury found Heyward guilty as indicted, and Heyward was sentenced to two consecutive terms of life imprisonment without the possibility of parole for murder and burglary, a consecutive term of thirty years for armed robbery, a consecutive term of thirty years for kidnapping, a consecutive term of ten years for assault and battery, and two concurrent terms of five years for pointing and presenting a firearm and unlawful possession of a firearm. This appeal followed.

**ISSUES ON APPEAL**

I.    Did the trial court err in admitting evidence and testimony regarding Granddaughter's identification of Heyward from the Lineup and her subsequent in-court identification?

II.   Did the trial court err in admitting the N.J. Fingerprints and testimony based on the N.J. Fingerprints?

III.  Did the trial court err in allowing expert opinion testimony about the operational capabilities of the gun?

IV.   Did the trial court err in allowing Heyward's alias, "Abdul Muslim," to be included in the indictments and at trial?

V.    Did the trial court err in admitting the photographs of Victim's internal head injuries?

VI.   Did the trial court err in denying Heyward's request to remove his shackles during jury selection?

VII.  Did the trial court err in denying Heyward's motion for a new trial?

**LAW/ANALYSIS**

**I.   Eyewitness Identification**

Heyward contends the trial court erred in admitting evidence and testimony regarding (1) Granddaughter's out-of-court identification of him based on the Lineup and (2) her subsequent in-court identification. Specifically, Heyward

argues Granddaughter's identifications should not have been admitted because (1) she did not make a positive identification when she viewed the Lineup and (2) the Lineup was unduly suggestive, unreliable, and conducive to irreparable misidentification. We disagree.

"Generally, the decision to admit an eyewitness identification is at the trial judge's discretion and will not be disturbed on appeal absent an abuse of such, or the commission of prejudicial legal error." *State v. Moore*, 343 S.C. 282, 288, 540 S.E.2d 445, 448 (2000).

### a. Positive Identification

First, Heyward contends Granddaughter did not make an out-of-court identification when viewing the Lineup. We disagree.

In *State v. Washington*, while evaluating the reliability of the witness's identification of the defendant, this court addressed the certainty of the witness's identification. 323 S.C. 106, 111–12, 473 S.E.2d 479, 481–82 (Ct. App. 1996). When the witness picked the defendant from a photographic lineup, he indicated he was "ninety nine percent sure" the defendant was the person who attempted to rob him, and his signed statement noted the defendant "best resembles" the attempted robber. *Id*. at 411, 473 S.E.2d at 481. This court found certainty is not always required in the identification of witnesses "[b]ecause the jury ha[s] the opportunity to observe the witness and attach the credibility it deem[s] proper to [the witness's] testimony, including the certainty or uncertainty of [the] identification." *Id*. at 111–12, 473 S.E.2d at 481–82.[4]

Granddaughter's out-of-court identification based on the Lineup was captured in the Recording. The Recording shows that after viewing the Lineup, Granddaughter indicated "Number three looks kind of like him . . . . Number three." Granddaughter circled the number three and wrote her first name next to it. Granddaughter then stated: "You're going to try to catch someone who looks like that . . . but it's probably not exactly because that isn't exactly . . . ." Investigator

---

[4] In concluding that certainty is not always required in the identification by a witness, the court in *Washington* cited *United States v. Peoples*, in which the Fourth Circuit Court of Appeals upheld the South Carolina district court's admission of an in-court identification by a witness and noted "an identification is not unreliable because it is phrased in uncertain terms." 323 S.C. at 111, 473 S.E.2d at 481–82 (citing *United States v. Peoples*, 748 F.2d 934, 936 (4th Cir. 1984) (per curiam)).

Clarke asked Granddaughter if she felt confident that was the man she picked out, and she stated, "Yes. That looked a lot like him . . . and I get really scared when I see him." When Granddaughter indicated that another man in the Lineup looked like her janitor, Investigator Clarke sought assurance that the other man did not look like the man who came into her house, and Granddaughter stated he did not. As the entirety of the trial transcript was not provided in the record, it is not clear if the jury viewed the Recording. However, even if the Recording was not viewed by the jury, Granddaughter stated, in the presence of the jury, that when viewing the Lineup, she looked for the person who looked most like the man who killed Victim and she selected number three because he scared her and he looked like him. Additionally, Heyward was able to cross-examine Granddaughter about the Lineup and about her conversation with Investigator Clarke. Based on the foregoing, we find the trial court did not err in admitting evidence regarding Granddaughter's out-of-court identification. Even though there was arguably some uncertainty in her initial selection, the jury was able to observe Granddaughter and attach credibility to her testimony. *See id.* (finding certainty is not always required in the identification of witnesses because the jury is able to observe the witness and consider the certainty or uncertainty of the identification when determining the witness's credibility).

### b. Suggestiveness and Reliability

Heyward also argues Granddaughter's out-of-court identification from the Lineup and her subsequent in-court identification of him should not have been admitted because the Lineup was unduly suggestive, unreliable, and conducive to irreparable misidentification. We disagree.

"[A]n eyewitness identification which is unreliable because of suggestive line-up procedures is constitutionally inadmissible as a matter of law." *Moore*, 343 S.C. at 288, 540 S.E.2d at 448. "[W]hether an eyewitness identification is sufficiently reliable is a mixed question of law and fact." *Id.* "In reviewing mixed questions of law and fact, whe[n] the evidence supports but one reasonable inference, the question becomes a matter of law for the court." *Id.*

In *Neil v. Biggers*, the Supreme Court set forth a two-prong inquiry to determine the admissibility of out-of-court identifications. 409 U.S. at 198–99. The first prong requires the court to determine whether the out-of-court identification was a result of "unnecessarily suggestive" police procedures. *State v. Dukes*, 404 S.C. 553, 557, 745 S.E.2d 137, 139 (Ct. App. 2013) (quoting *Biggers*, 409 U.S. at 198–99). If the court finds that impermissibly suggestive police procedures were not used, the inquiry ends, and the court does not consider the second prong. *Id.* at

557–58, 745 S.E.2d at 139. However, if the court finds impermissibly suggestive identification procedures were used, the court must determine whether the identification was "so reliable that no substantial likelihood of misidentification existed." *Id*. at 558, 745 S.E.2d at 139 (quoting *State v. Liverman*, 398 S.C. 130, 138, 727 S.E.2d 422, 426 (2012)). If an out-of-court identification is the result of unnecessarily suggestive police procedures, an in-court identification is inadmissible. *State v. Brown*, 356 S.C. 496, 502–03, 589 S.E.2d 781, 784 (Ct. App. 2003).

Heyward argues Investigator Clarke telling Granddaughter to be brave and help him without telling her she did not have to choose anyone before showing her the Lineup was unnecessarily suggestive. However, before showing Granddaughter the Lineup, Investigator Clarke said, "See *if* you can see the bad man who did this to your grandmomma" and noted "*if* you see the man you saw in your house yesterday that hurt your grandma, I want you to tell me, okay?" (emphasis added). Although Investigator Clarke did not specifically tell Granddaughter she did not have to choose anyone from the Lineup, we found no authority requiring him to do so. Furthermore, Investigator Clarke's use of the word "if" suggested to Granddaughter she did not have to choose someone from the Lineup. The record also indicates Granddaughter did not believe she had to choose someone from the Lineup because at trial, she testified she would not have picked anyone from the Lineup if she did not see someone that looked like the man who killed Victim. At trial, Granddaughter stood by her selection of Heyward when she (1) indicated number three in the Lineup was the man who tied her up and killed Victim, (2) pointed to Heyward when asked if that man was in the courtroom, and (3) stated there was no doubt in her mind that Heyward was the man who hurt Victim.

Heyward also argues Granddaughter's repeated exposure to Heyward's photograph and the fact that Heyward was the only one from the Lineup present in the courtroom when Granddaughter made her in-court identification influenced her identification of Heyward as Victim's killer. We disagree. Nothing in the record indicates Granddaughter was exposed to Heyward's photograph repeatedly, and we found no authority requiring other members of a photograph lineup to be present in court. Because we find the Lineup was not unduly suggestive, we are not required to consider whether Granddaughter's identification of Heyward was reliable. *See Dukes*, 404 S.C. at 557–58, 745 S.E.2d at 139 (stating if the court finds that impermissibly suggestive police procedures were not used, the inquiry ends, and the court does not consider the second prong of reliability). Thus, we find the trial court did not abuse its discretion in admitting evidence and testimony regarding Granddaughter's out-of-court identification of Heyward. *See Moore*, 343 S.C. at

288, 540 S.E.2d at 448 ("[T]he decision to admit an eyewitness identification is at the trial judge's discretion and will not be disturbed on appeal absent an abuse of such, or the commission of prejudicial legal error.").

Furthermore, Heyward's challenge of Granddaughter's in-court identification was predicated upon his argument that the out-of-court identification was improper. *See Brown*, 356 S.C. at 502–03, 589 S.E.2d at 784 (finding that if an out-of-court identification is the result of unnecessarily suggestive police procedures, an in-court identification is inadmissible). Because we find the trial court did not err in admitting the out-of-court identification, we find the trial court did not abuse its discretion in admitting the in-court identification. *See Moore*, 343 S.C. at 288, 540 S.E.2d at 448 ("[T]he decision to admit an eyewitness identification is at the trial judge's discretion and will not be disturbed on appeal absent an abuse of such, or the commission of prejudicial legal error."); *see also Brown*, 356 S.C. at 502–03, 589 S.E.2d at 784 ("An in court identification of an accused is inadmissible if a suggestive out-of-court identification procedure created a very substantial likelihood of irreparable misidentification.")

## II. Fingerprints

Heyward contends the trial court erred in admitting the N.J. Fingerprints because they were not properly authenticated by the State. Specifically, Heyward contends the trial court improperly allowed evidence regarding the match between the N.J. Fingerprints and the Crime Scene Fingerprints because the State failed to establish when and where the N.J. Fingerprints were taken. Although we agree the State failed to establish when and where the N.J. Fingerprints were taken, we, nevertheless, find the N.J. Fingerprints were properly authenticated.

"The admissibility of evidence is within the sound discretion of the trial judge." *State v. Mansfield*, 343 S.C. 66, 77, 538 S.E.2d 257, 263 (Ct. App. 2000). "Accordingly, evidentiary rulings of the trial court will not be reversed on appeal absent an abuse of discretion or the commission of a legal error which results in prejudice to the defendant." *Id*. "Prejudice occurs when there is reasonable probability the wrongly admitted evidence influenced the jury's verdict." *State v. Byers*, 392 S.C. 438, 444, 710 S.E.2d 55, 58 (2011). "Where 'guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached,' an insubstantial error that does not affect the result of the trial is considered harmless." *Id.* at 447, 710 S.E.2d at 60 (quoting *State v. Pagan*, 369 S.C. 201, 212, 631 S.E.2d 262, 267 (2006)).

In evaluating the admissibility of fingerprint cards, our supreme court has adopted a two-prong approach. *State v. Anderson*, 386 S.C. 120, 126, 687 S.E.2d 35, 38 (2009). First, the court must determine "whether the fingerprint card was testimonial in nature and, if so, fell within an exception to the hearsay rule." *Id*. If there is an applicable hearsay exception, the court then must assess authentication. *Id.*

On appeal, Heyward does not contend the N.J. Fingerprints were hearsay. Thus, we confine our analysis to the determination of the authenticity of the N.J. Fingerprints.

In *Anderson*, our supreme court provided an analysis of the pertinent rules of evidence to highlight ways in which fingerprints could be authenticated. *Id*. at 128–29, 687 S.E.2d at 39. The court cited to the non-exhaustive examples of authentication contained in Rule 901(b), SCRE. *Id*. at 129, 687 S.E.2d at 39. The court found Rule 901(b)(4),[5] (7),[6] and (9),[7] provided for authentication of the fingerprints obtained from AFIS in that case. *Id*. at 129–32, 687 S.E.2d at 39–41. It also found even if the evidence did not precisely fit within one of the examples provided in Rule 901(b), a more generalized approach to Rule 901 would also provide for authentication in that case because an expert in fingerprint analysis "testified regarding the method and technology in which he analyzed the latent fingerprints with the known prints . . . [, which] included a thorough explanation of how an arrestee's fingerprints are taken, stored, and maintained." *Id*. at 131–32, 687 S.E.2d at 41. The court also noted that the expert used the officially-maintained known fingerprints and opined that they matched the latent fingerprint found at the victims' home. *Id*. at 132, 687 S.E.2d at 41. Our supreme court found this was sufficient "to support a finding that the matter in question [was] what [the State] claim[ed]." *Id*. (quoting Rule 901(a), SCRE).

---

[5] Rule 901(b)(4) states "[the a]ppearance, contents, substance, internal patterns, or other distinctive characteristics [of the item], taken together with all the circumstances" may be used to authenticate evidence.

[6] Rule 901(b)(7) provides authentication can be established by "[e]vidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept."

[7] Rule 901(b)(9) provides authentication can be established by "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result."

In this case, we find Rule 901(b)(3), SCRE, allows the authentication of the N.J. Fingerprints. Rule 901(b)(3) provides "[a c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated" can authenticate evidence. On appeal, Heyward does not argue that the Booking Fingerprints were not authenticated. *Smith v. State*, 413 S.C. 194, 196, 775 S.E.2d 696, 697 (2015) (stating an unappealed ruling is the law of the case). Investigator Odom was qualified as an expert in latent print analysis. Although she stated she did not conduct a minutia comparison between the N.J. Fingerprints and the Booking Fingerprints, she compared the two sets of fingerprints and stated that pattern wise, the prints were the same. Investigator Odom testified there was no doubt the same person made the N.J. Fingerprints and the Booking Fingerprints. Because Investigator Odom compared the N.J. Fingerprints with the authenticated Booking Fingerprints, the N.J. Fingerprints were authenticated by the comparison of the two sets of fingerprints by the expert witness pursuant to Rule 901(b)(3).[8] Thus, we find the trial court did not err in admitting the N.J. Fingerprints.

### III. Operational Capabilities of the Gun

Heyward argues the trial court erred in allowing expert testimony about the operational capabilities of the recovered firearm. Specifically, he contends the testimony was not relevant to the charges against him and was needlessly

---

[8] Furthermore, even if the N.J. Fingerprints would not have been properly authenticated, any error was harmless because it did not prejudice Heyward. *See State v. Adams*, 354 S.C. 361, 381, 580 S.E.2d 785, 795 (Ct. App. 2003) ("[A]n insubstantial error not affecting the result of the trial is harmless where 'guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached.'" (quoting *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989))). Investigator Odom testified she used both the N.J. Fingerprints and the Booking Fingerprints to determine that Heyward's fingerprints matched the fingerprints found at the crime scene. Outside of the other fingerprint evidence, Granddaughter identified Heyward as Victim's killer; DNA evidence obtained at the crime scene was a match to Heyward; a gun matching Granddaughter's description of the assailant's gun was found in the home in which Heyward was living; there was testimony that Heyward's wife called in a false CrimeStopper tip to divert attention from him; and Canzater testified Heyward had been to Victim's home with her, was wearing clothing that matched the description of the suspect on the day of the murder, and shaved his head after she confronted him with the news of Victim's death.

cumulative and prejudicial.  We find the trial court erred in allowing the expert testimony, but such error was harmless.

"The decision to admit or exclude testimony from an expert witness rests within the trial court's sound discretion."  *State v. Price*, 368 S.C. 494, 498, 629 S.E.2d 363, 365 (2006).  Thus, the trial court's admission of expert testimony will not be reversed unless there was an abuse of discretion, which occurs when the trial court's decision is based on an error of law or a factual conclusion without evidentiary support.  *Id.*  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 401, SCRE.

The trial court found the operability of the gun was relevant to the pointing and presenting charge.  The trial court also found the operability of the gun was relevant to the robbery charge as to whether or not the gun was an instrument that could cause great bodily harm.  We disagree.

Section 16-23-410 of the South Carolina Code (2015) provides: "It is unlawful for a person to present or point at another person a loaded or unloaded firearm."  Section 16-23-405 of the South Carolina Code (2015) defines "firearm" for purposes of chapter 23, which includes section 16-23-410, as a "rifle, shotgun, pistol, or similar device that propels a projectile through the energy of an explosive."  Subsection 16-11-330(A) of the South Carolina Code (2015) defines armed robbery as follows:

> [R]obbery while armed with a pistol, dirk, slingshot, metal knuckles, razor, or other deadly weapon, or while alleging, either by action or words, he was armed while using a representation of a deadly weapon or any object which a person present during the commission of the robbery reasonably believed to be a deadly weapon.

"All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in light of the intended purpose of the statute."  *State v. Sweat*, 386 S.C. 339, 350, 688 S.E.2d 569, 575 (2010) (quoting *Broadhurst v. City of Myrtle Beach Election Comm'n*, 342 S.C. 373, 380, 537 S.E.2d 543, 546 (2000)).  "A statute should be so construed that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous."  *Id.* at 351, 688 S.E.2d at 575 (quoting *In re Decker*, 322 S.C. 215, 219, 471 S.E.2d 462, 463

(1995)).  However, "[c]ourts will reject a statutory interpretation which would lead to a result so plainly absurd that it could not have been intended by the Legislature or would defeat the plain legislative intention."  *Id.*

Because section 16-23-410 provides it is unlawful to present or point an unloaded firearm at another person, it would produce an absurd result that would defeat the plain legislative intent of the pointing and presenting charge to require proof that the firearm is capable of propelling a projectile while also allowing an unloaded gun to meet the criteria.  Likewise, because subsection 16-11-330(A) provides that being armed with a representation of a deadly weapon meets the criteria for armed robbery, it would produce an absurd result to require proof that the firearm was operational.  Thus, we find the trial court abused its discretion in allowing expert testimony about the operational capabilities of the firearm because such testimony was not relevant to Heyward's charges.

However, we find this error harmless because it did not prejudice Heyward.  *See Adams*, 354 S.C. at 381, 580 S.E.2d at 795 ("[A]n insubstantial error not affecting the result of the trial is harmless where 'guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached.'" (quoting *Bailey*, 298 S.C. at 5, 377 S.E.2d at 584)).  Granddaughter identified Heyward as Victim's killer; fingerprint and DNA evidence obtained at the crime scene were matched to Heyward; a gun matching Granddaughter's description of the assailant's gun was found in the home where Heyward lived; there was testimony that Heyward's wife called in a false CrimeStopper tip to divert attention from Heyward; and Canzater testified Heyward had been to Victim's home with her, was wearing clothing that matched the description of the suspect on the day of the murder, and shaved his head after she confronted him with the news of Victim's death.  Thus, we find the admission of the expert testimony regarding the operational capabilities of the gun was harmless and does not require reversal.

## IV.    The Alias

Heyward contends the trial court erred in allowing his alias "Abdul Muslim" to be used in the indictments and at trial because use of the alias invited undue prejudice from the jury.  We disagree.

An appellate court reviews the trial court's ruling on a motion to strike for an abuse of discretion.  *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. Ct. App. 2006); *Totaro v. Turner*, 273 S.C. 134, 135, 254 S.E.2d 800, 801 (1979).

In *United States v. Clark*, the Fourth Circuit Court of Appeals held:

If the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment, the inclusion of the alias in the indictment is both relevant and permissible, and a pretrial motion to strike should not be granted.

541 F.2d 1016, 1018 (4th Cir. 1976) (per curiam). "However, if the prosecution either fails to offer proof relating to the alias or the alias, although proven, holds no relationship to the acts charged, a motion to strike may be renewed, the alias stricken and an appropriate instruction given to the jury." *Id*. "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.'" *United States v. Scarpa*, 913 F.2d 993, 1013 (2nd Cir. 1990) (quoting *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id*. (alteration in original) (quoting *United States v. DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978)). "Aliases and nicknames should not be stricken from an indictment when evidence regarding those aliases or nicknames will be presented to the jury at trial." *United States v. Rittweger*, 259 F. Supp.2d 275, 293 (S.D.N.Y. 2003).

We find the trial court properly denied Heyward's pretrial motion to strike the alias because the State established it intended "to introduce evidence of an alias and [that] the use of that alias [was] necessary to identify [Heyward] in connection with the acts charged in the indictment." *See Clark*, 541 F.2d at 1018 ("If the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment, the inclusion of the alias in the indictment is both relevant and permissible, and a pretrial motion to strike should not be granted."). During the pretrial motions hearing, the State indicated DNA found under Victim's fingernail scrapings produced a Combined DNA Index System (CODIS) hit that linked the sample to Abdul Muslim. Heyward's name was not associated with the hit, but the information on Abdul Muslim found through CODIS included fingerprints that matched Heyward's fingerprints. The State argued it believed Heyward was going to challenge the DNA expert's, Dr. Greg Amick, findings, so it thought the alias was relevant because it supported Dr. Amick's findings. The State further indicated it would amend the indictment to remove "Abdul Muslim" if Heyward agreed not to challenge the DNA evidence. Based on the foregoing, we find the

State sufficiently established it intended to introduce evidence of the alias and that the alias was necessary to connect the acts charged with Heyward.[9]

Based on the foregoing, we find the trial court did not err in denying Heyward's motion to strike the alias from the indictments.[10]

## V.    The Photographs

Heyward argues the trial court erred in admitting autopsy dissection photographs (the Photographs) of Victim's internal head injuries because the Photographs were irrelevant, lacked probative value, and were calculated to inflame the passions of the jury. Specifically, Heyward asserts the Photographs lacked probative value because the cause of Victim's death was strangulation, not injuries to her head, and because the Photographs led to a risk of undue prejudice based on their gruesome nature. We disagree.

"The relevancy, materiality, and admissibility of photographs as evidence are matters left to the sound discretion of the trial court." *State v. Nance*, 320 S.C. 501, 508, 466 S.E.2d 349, 353 (1996). A trial court's "decision regarding the

---

[9] The State offered proof at trial that the alias held a relationship to the acts charged. However, even if it would have failed to do so, the use of the alias would not have been an error because Heyward did not renew his motion to strike. *See id.* ("[I]f the prosecution either fails to offer proof relating to the alias or the alias, although proven, holds no relationship to the acts charged, a motion to strike may be renewed, the alias stricken and an appropriate instruction given to the jury."); *id.* (finding even though the existence of the appellant's alias did not connect his identity to the robbery, because the appellant did not renew his motion to strike and because there was no showing the use of the alias was prejudicial, the use of the alias was not an error).

[10] Heyward also argues he was unfairly prejudiced by the inclusion of the alias. We disagree. *See Scarpa*, 913 F.2d at 1013 ("[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." (alteration in original) (quoting *DePalma*, 461 F. Supp. at 797)). Furthermore, the trial court noted it believed any potential prejudice stemming from the alias could be addressed by voir dire, and Heyward conceded "I certainly do not disagree with you that voir dire can address the issue of prejudice." *See State v. Rios*, 388 S.C. 335, 341, 696 S.E.2d 608, 612 (Ct. App. 2010) (stating appellate review of an issue is not preserved when it was conceded at trial).

comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances." *State v. Collins*, 409 S.C. 524, 534, 763 S.E.2d 22, 28 (2014) (quoting *State v. Adams*, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003)). In balancing the danger of unfair prejudice with the probative value of a piece of evidence, "the determination must be based on the entire record and will turn on the facts of each case." *State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008).

"To be classified as unfairly prejudicial, photographs must have a 'tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Torres*, 390 S.C. 618, 623, 703 S.E.2d 226, 228–29 (2010) (quoting *State v. Franklin*, 318 S.C. 47, 55, 456 S.E.2d 357, 361 (1995)). "[P]hotographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or unnecessary to the issues at trial." *State v. Johnson*, 338 S.C. 114, 122, 525 S.E.2d 519, 523 (2000). However, "[i]t is well settled in this state that '[i]f the [. . . ] photograph serves to corroborate testimony, it is not an abuse of discretion to admit it.'" *Torres*, 390 S.C. at 623, 703 S.E.2d at 229 (first alteration in original) (quoting *Nance*, 320 S.C. at 508, 466 S.E.2d at 353). Our courts have found autopsy photographs may be admitted "in an effort to show the circumstances of the crime and character of the defendant." *Id*. "'The mere fact that an item of evidence is gruesome or revolting, if it sheds light on, strengthens or gives character to other evidence sustaining the issues in the case, should not exclude it.'" *Collins*, 409 S.C. at 535, 763 S.E.2d at 28 (quoting *Nichols v. State*, 100 So. 2d 750, 756 (Ala. 1958)).

In *State v. Gray*, this court found the trial court did not abuse its discretion when it admitted three photographs, which were taken during an autopsy and showed the victim's exposed skull and brain. 408 S.C. 601, 609, 619, 759 S.E.2d 160, 165, 170 (Ct. App. 2014). This court found the photographs had probative value because they corroborated the pathologist's findings concerning the extent and location of the victim's head injuries and cause of death and were important to the State's ability to prove malice. *Id*. at 612–16, 759 S.E.2d at 166–68.

In the present case, we find the trial court properly evaluated the probative value of the Photographs with respect to the question of malice. *See State v. Hawes*, 423 S.C. 118, 130–31, 813 S.E.2d 513, 519–20 (Ct. App. 2018) (finding the trial court did not abuse its discretion when it admitted crime scene photographs that established the circumstances of the crime scene, corroborated the testimony of a witness and a responding officer, and were relevant to the issue of malice); *id*. at 131, 813 S.E.2d at 520 (noting "the crime scene photographs were relevant to the issue of malice because they showed how, where, and how many times [the victim]

was attacked."); *see also Nance*, 320 S.C. at 508, 466 S.E.2d at 353 (finding photographs of the victim's stab wounds were "relevant to the issue of malice"). Heyward was charged with murder, and section 16-3-10 of the South Carolina Code (2015) provides, "'Murder' is the killing of any person with malice aforethought, either express or implied." "'Malice aforethought' is defined as 'the requisite mental state for common-law murder' and it utilizes four possible mental states to encompass both specific and general intent to commit the crime." *State v. Kinard*, 373 S.C. 500, 503, 646 S.E.2d 168, 169 (Ct. App. 2007) (quoting *Black's Law Dictionary* (7th ed. 1999)), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019). Dr. Durso testified Victim's head injuries demonstrated that a struggle occurred and Victim suffered a violent death. Dr. Durso stated the injuries show Victim was struck on multiple planes of her head and there was not just one terminal fall, which indicated there was more than just a strangulation. Thus, we find the Photographs were important to establish that Heyward acted with malice. *See Nance*, 320 S.C. at 508, 466 S.E.2d at 353; *Gray*, 408 S.C. at 614, 759 S.E.2d at 167.

Furthermore, we find the trial court properly determined the Photographs corroborated Dr. Durso's testimony. *See Torres*, 390 S.C. at 623, 703 S.E.2d at 229 ("It is well settled in this state that '[i]f the [. . . ] photograph serves to corroborate testimony, it is not an abuse of discretion to admit it.'" (first alteration in original) (quoting *Nance*, 320 S.C. at 508, 466 S.E.2d at 353)). Although Victim's cause of death was strangulation, Dr. Durso testified Victim's head injuries indicated she suffered a violent death involving more than just strangulation and that those injuries contributed to her conclusion of the cause of death. Dr. Durso also testified the Photographs would be necessary to assist her in explaining Victim's head injuries to the jury. Thus, we find Dr. Durso's testimony increased the probative value of the Photographs because her use of the Photographs to explain Victim's injuries demonstrated "the extent and nature of the injuries in a way that would not be as easily understood based on [expert] testimony alone." *State v. Holder*, 382 S.C. 278, 290, 676 S.E.2d 690, 697 (2009).

Moreover, we have viewed the photographs, and we find they were not unduly prejudicial to Heyward. *See Torres*, 390 S.C. at 623, 703 S.E.2d at 228–29 ("To be classified as unfairly prejudicial, photographs must have a 'tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.'" (quoting *Franklin*, 318 S.C. at 55, 456 S.E.2d at 361)). Based on the foregoing, we find the trial court did not abuse its discretion in admitting the Photographs.

## VI.    The Shackles

Heyward contends the trial court erred in denying his request to remove his shackles during jury selection.  Specifically, Heyward argues the trial court abused its discretion because (1) it failed to properly exercise its discretion and (2) there was no evidence of a security concern that would outweigh the prejudice to Heyward of appearing before potential jurors in shackles.  We agree the trial court abused its discretion in denying Heyward's motion to remove his shackles during jury selection, but we find such error was harmless.

"Whether a defendant is restrained during trial is within the trial judge's discretion.  The trial judge is to balance the prejudicial effect of shackling with the considerations of courtroom decorum and security." *State v. Tucker*, 320 S.C. 206, 209, 464 S.E.2d 105, 107 (1995).

In *Deck v. Missouri*, the defendant was shackled with leg irons, handcuffs, and a belly chain, which would have been readily apparent to the jury, during the penalty phase of a capital case.  544 U.S. 622, 624 (2005).  The State claimed the Missouri Supreme Court's decision met the Constitution's requirements regarding the shackling of a defendant during trial because the Missouri Supreme Court properly found (1) the record lacked evidence that the jury saw the defendant's restraints, (2) the trial court acted within its discretion, and (3) the defendant suffered no prejudice.  *Id*. at 634.  The Supreme Court disagreed, noting the record (1) indicated the jury was aware of the defendant's shackles and (2) contained no formal or informal findings.  *Id*.  The Supreme Court further indicated Missouri's argument failed to take into account the Court's statement in *Holbrook v. Flynn* that shackling is "inherently prejudicial."  *Id*. at 635 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986)).  Ultimately, the Supreme Court held "the Constitution forbids the use of *visible* shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is 'justified by an essential state interest'— such as the interest in courtroom security—specific to the defendant on trial."  *Id.* at 624 (quoting *Holbrook*, 475 U.S. at 568–69 (emphasis added)).

Like in *Deck*, the record contains no formal or informal findings of fact to indicate the trial court exercised its discretion in denying Heyward's request to remove his shackles as the trial court merely stated "that motion is denied."  *Id*. at 634 (rejecting Missouri's argument that the trial court acted in its discretion because the record contained no formal or informal findings).  The record is devoid of any reason why Heyward should have been shackled.  There were no concerns of courtroom decorum or security raised, as the only mention of courtroom security was Heyward's assertion that he was well-behaved in his three prior court

appearances. Thus, we find the trial court abused its discretion in denying Heyward's request to remove his shackles during jury selection. *See Tucker*, 320 S.C. at 209, 464 S.E.2d at 107 ("The trial judge is to balance the prejudicial effect of shackling with the considerations of courtroom decorum and security"); *see also Deck*, 544 U.S. at 624 ("[T]he Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." (quoting *Holbrook*, 475 U.S. at 568–69)); *State v. Brawley*, 137 A.3d 757, 761 (Conn. 2016) (noting a trial court must ensure its reasons for ordering the use of shackles are detailed in the record).

However, we find any error in denying the motion to remove Heyward's shackles was harmless because Heyward was not prejudiced. *See State v. Northcutt*, 372 S.C. 207, 217, 641 S.E.2d 873, 878 (2007) ("Whether an error is harmless depends on the circumstances of the particular case. No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it 'could not reasonably have affected the result of the trial.'" (quoting *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985))).

In regards to the burden of proof, *Deck* provided:

> [W]here a court, without adequate justification, orders the defendant to wear shackles *that will be seen by the jury*, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'

544 U.S at 635 (second alteration in original) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967) (emphasis added)). However, the court in *Deck* repeatedly noted the visibility of the defendant's shackles,[11] and we have not found any Supreme Court or South Carolina authority directly addressing whether the

---

[11] The Court noted the record made it "clear that the jury was aware of the shackles." *Id*. at 634. The Supreme Court also referred to "visible shackles," "restraints visible to the jury," and "shackles that will be seen by the jury." *Id*. at 624, 626, 628–29, 632, 635.

heightened burden in *Deck* applies when it is not obvious from the record that the shackles were observed.

In *State v. Johnson*, the defendant argued the trial court erred in denying his motion for mistrial based on his being brought into the courthouse in handcuffs and accompanied by police personnel because he argued jurors may have seen him and that he had been prejudiced by the indicia of guilt.  422 S.C. 439, 446, 812 S.E.2d 739, 742, 745 (Ct. App. 2018).  This court did not directly address *Deck* or whether the heightened burden of proof is applied when it is not obvious from the record that shackles were observed.  However, this court found the trial court did not err in denying the defendant's motion for a mistrial based on his being brought into the courthouse in handcuffs and surrounded by police personnel because "the record fail[ed] to demonstrate any juror observed this activity or that any juror was prejudiced."  *Id*. at 458, 812 S.E.2d at 749.

We find this court's approach in *Johnson* is in line with courts in other jurisdictions that have specifically found "that *Deck*'s heightened constitutional standard is applicable only when there is evidence that jurors observed the restraints or that they were plainly visible," and thus, "absent evidence that a juror observed the restraints . . . a trial court's error in shackling a defendant is harmless."[12]  *Hoang v.*

---

[12] *See also Brawley*, 137 A.3d at 760 (indicating that in cases in which the jury cannot see any shackling, "'[t]he defendant bears the burden of showing he has suffered prejudice by establishing a factual record demonstrating that the members of the jury knew of the restraints'" except for in cases in which a court requires a defendant to wear shackles that will be seen by the jury without adequate justification (quoting *State v. Webb*, 680 A.2d 147, 183 (Conn. 1996))); *id*. at 762 n.3 ("*Deck* makes clear that a heightened burden falls on the state when the unwarranted restraints *are visible* to the jury, and not when as in [*United States v.*] *Banegas* [600 F.3d 342 (5th Cir. 2010)], the record is silent on the matter."); *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008) ("*Deck*'s facts and holding . . . concerned only *visible* restraints at trial.  The Supreme Court was careful to repeat this limitation throughout its opinion."); *People v. Letner & Tobin*, 235 P.3d 62, 106 (Cal. 2010) (indicating *Deck* did not support the contention that the prosecution was required to disprove the visibility of the restraints when the record contained no evidence that the jury observed the defendant wearing shackles); *United States v. Baker*, 432 F.3d 1189, 1246 (11th Cir. 2005) (finding the combination of the number of defendants, the defense's opportunity to respond to the court's concerns and raise alternative proposals, "and the lack of any record evidence that the jury could see the shackles" showed the district court did not

*People*, 323 P.3d 780, 785–86 (Colo. 2014).[13]  Although Heyward objected to being shackled at his feet, arguing any potential juror in the first two rows of the gallery directly behind him could see the shackles, nothing in the record indicates that any of the jurors who were selected for Heyward's trial could or did see his shackles.  We also note Heyward was only shackled during the jury selection and he was not shackled during trial.  *See State v. Clark*, 24 P.3d 1006, 1029 (Wash. 2001) (en banc) ("Because the impact of shackling on the presumption of innocence is the overarching constitutional concern, it would logically follow that in the minds of the jurors [the defendant's] shackling on the first day of voir dire was more than logically offset by over two weeks of observing Clark in the courtroom without shackles.").  Based on the foregoing, we find the trial court's error in denying Heyward's motion to remove his shackles during jury selection did not constitute reversible error.

## VII.   Cumulative Error

---

abuse its discretion in shackling a defendant), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006); *State v. Johnson*, 229 P.3d 523, 533 (N.M. 2010) (indicating the factors tending to show prejudice were not violated when there was no indication the jury saw the defendant's leg irons so that the defendant's presumption of innocence was not violated); *Bell v. State*, 415 S.W.3d. 278, 283 (Tex. Crim. App. 2013) (indicating when the record did not show a reasonable probability that the jury was aware of the defendant's shackles, the heightened constitutional standard did not apply).

[13] In contrast, we note that in *Banegas*, the Fifth Circuit Court of Appeals applied the heightened harmless error standard set forth in *Deck* for cases in which the circuit court did not provide a reason for shackling a defendant and the reasons for shackling a defendant are not apparent based on the specific facts of the case.  600 F.3d at 345–46.  The court found "the defendant need not demonstrate actual prejudice on appeal to make out a due process violation; rather the burden is on the government to prove 'beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained.'"  *Id.* (footnote omitted) (quoting *Deck*, 544 U.S. at 635).  The court in *Banegas* vacated the defendant's conviction and remanded his case for a new trial because the district court did not express individualized reasons for its decision to shackle the defendant with leg irons and the government did not proffer evidence to prove beyond a reasonable doubt that the defendant's presumably visible leg irons did not contribute to the jury verdict.  *Id*. at 347.

Heyward argues he is entitled to a new trial because cumulative errors committed by the trial court had the effect of preventing him from receiving a fair trial. We disagree.

We find this issue is not preserved for our review because Heyward neither raised the cumulative error doctrine to the trial court nor did he argue he was entitled to a new trial based upon errors made during the trial. *See State v. Beekman*, 405 S.C. 225, 236, 746 S.E.2d 483, 489 (Ct. App. 2013) (noting the cumulative error doctrine was not preserved for appeal when the appellant did not raise the doctrine to the trial court or argue he was entitled to a new trial based upon errors made during the trial), *aff'd*, 415 S.C. 632, 785 S.E.2d 202 (2016).

**CONCLUSION**

Based on the foregoing, Heyward's convictions are

**AFFIRMED.**

**KONDUROS and HILL, JJ., concur.**