# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

James Heyward, Petitioner.

Appellate Case No. 2021-000122

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Richland County
R. Knox McMahon, Circuit Court Judge

---

Opinion No. 28182
Heard May 17, 2023 – Filed October 5, 2023

---

## AFFIRMED AS MODIFIED

---

Madison Claire Healy, of K&L Gates LLP, of Raleigh;
Tara C. Sullivan and Jennifer Hess Thiem, of K&L Gates
LLP, of Charleston; Chief Appellate Defender Robert
Michael Dudek, of Columbia, all for Petitioner.

Attorney General Alan McCrory Wilson, Assistant
Attorney General William Joseph Maye, Deputy Attorney
General Donald J. Zelenka, Senior Assistant Deputy
Attorney General Melody Jane Brown, Solicitor Byron E.
Gipson, of Columbia, all for Respondent.

---

**JUSTICE FEW:** James Heyward was convicted of multiple crimes arising from the armed robbery, brutal beating, and murder of Alice Tollison during the burglary of

her home.  We granted Heyward's petition for a writ of certiorari to address the trial court's refusal to remove Heyward's leg shackles during the striking of the jury, and four evidentiary issues.  As to three of the evidentiary issues—the authentication of a fingerprint card, the admission of gruesome autopsy photographs, and the State's use of Heyward's alias—we find the trial court acted within its discretion.  As to the other evidentiary issue—a firearms expert's testimony Heyward's pistol was operational at the time of the crimes—we affirm the court of appeals' ruling that if there was any error in the admission of that testimony it did not prejudice Heyward.  As to the leg shackles, we find the trial court erred in failing to exercise its discretion in determining whether Heyward should be required to wear leg shackles in the presence of the jury.  However, because the State conclusively proved Heyward's guilt through overwhelming evidence such that no rational conclusion could have been reached other than Heyward is guilty of these crimes, we nevertheless affirm.

## I.    Facts and Procedural History

On Sunday October 11, 2015, Tollison and her granddaughter—then eight years old—went to church, returned to Tollison's home, and began watching television.  When they heard a knock at the door, Tollison went to answer it.  According to the granddaughter's testimony at trial, the granddaughter stayed on the couch for a few minutes before going into the kitchen "to get some of my toys."  In the kitchen, she found Tollison sitting at the table, and a man told the granddaughter to sit across the table from her.  The man was carrying a duffel bag, and the granddaughter saw him take out a pistol, place it on the kitchen table, and demand money from Tollison.  After Tollison refused to give the man any money, the man strangled her grandmother to unconsciousness while she watched.  The man then ordered the granddaughter to go into a closet and shut the door.  While she was in the closet, she heard the man rummaging through the house.  He returned to the closet, moved her to another room, and tied her arms and legs with electrical cords.  The man eventually left the house, taking with him items of Tollison's personal property.  The granddaughter testified she struggled to free herself for approximately thirty minutes and fell asleep.  When she awoke, she was able to loosen the cords enough to reach the kitchen and call 9-1-1.  When officers arrived, Tollison was dead.

Initially, officers investigating the crimes did not have a suspect.  A fingerprint expert with the Richland County Sheriff's Department—Investigator Trisha Odom—found fingerprints at the crime scene and had them uploaded into the FBI's Automated Fingerprint Identification System—commonly referred to as AFIS—to search for a match.  That search returned a match for James Heyward from a fingerprint card entered into AFIS from New Jersey.  Based on this match, officers

included a picture of Heyward in a photographic lineup shown to the granddaughter. The granddaughter identified Heyward as the man who robbed and murdered her grandmother.

Officers soon arrested Heyward for the crimes and took his fingerprints when they booked him into jail. Investigator Odom compared fingerprints taken from him at the time of his arrest—the "booking prints"—to the prints found at the crime scene. From that comparison, Odom concluded the crime scene prints belonged to Heyward. Odom testified she also compared the New Jersey prints to the booking prints and crime scene prints and found all three sets of prints to match.

Other investigators collected DNA samples from scrapings underneath Tollison's fingernails, the skin of her neck, and several other places. A DNA expert testified the DNA under Tollison's fingernails and on her neck matched James Heyward to a high degree of certainty.

During the striking of the jury, Heyward's counsel asked the trial court to remove the shackles from around Heyward's lower legs because—counsel told the court— the shackles were visible to the jury pool. The trial court responded without discussion, "All right. That motion is denied."

The jury found Heyward guilty of murder, burglary in the first degree, armed robbery, two counts of kidnapping, assault and battery in the first degree, pointing and presenting a firearm, and unlawful possession of a firearm by a person convicted of a crime of violence. The trial court sentenced Heyward to life in prison for both murder and burglary, and an additional seventy years for the other crimes consecutive to the life sentences. The court of appeals affirmed. *State v. Heyward*, 432 S.C. 296, 852 S.E.2d 452 (Ct. App. 2020).

## II. Analysis

We will address the five substantive issues in this section and whether any error warrants a new trial in section III.

### A. Leg Shackles

"The law has long forbidden routine use of visible shackles during [a jury trial]; it permits a State to shackle a criminal defendant only in the presence of a special need." *Deck v. Missouri*, 544 U.S. 622, 626, 125 S. Ct. 2007, 2010, 161 L. Ed. 2d 953, 960 (2005); *see also id.* ("This rule has deep roots in the common law." (citing

4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 317 (1769))).  As the *Deck* Court stated, "Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process."  544 U.S. at 630, 125 S. Ct. at 2013, 161 L. Ed. 2d at 963.  Thus, American trial courts long ago "settled virtually without exception on a basic rule embodying notions of fundamental fairness: Trial courts may . . . shackle defendants . . . only if there is a particular reason to do so."  544 U.S. at 627, 125 S. Ct. at 2011, 161 L. Ed. 2d at 961; *see also Holbrook v. Flynn*, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 1345-46, 89 L. Ed. 2d 525, 534 (1986) (observing that "shackling" a defendant during a jury trial is an "inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest specific to each trial").[1]

This Court addressed whether "the shackling of appellant violate[s] his [constitutional] rights" in *State v. Tucker*, 320 S.C. 206, 209, 464 S.E.2d 105, 107 (1995).  After first finding the trial court in that case articulated a valid reason for requiring the defendant be shackled, we explained the trial court acted within its discretion in balancing the prejudicial effects of shackling against the valid State interest in having the defendant shackled.  First, the trial court made sure the defendant's shackles "were not visible to the jury."  *Id.*  We further explained,

> Throughout the trial, the judge ensured appellant was sitting at the defense table or on the stand prior to the jury's entrances and exits into the courtroom.
>
> The trial judge took precautions to minimize any prejudice the restraints might have caused throughout the trial and offered to give a curative instruction to explain appellant's failure to stand when the judge entered and exited the courtroom.  Balancing the effect of the restraints and the need for security, the trial judge did not err in restraining appellant based upon appellant's prior history of escapes and his resistance to arrest.

---

[1] The court of appeals' statement "Heyward was not prejudiced" by being forced to wear shackles in the presence of the jury is inconsistent with *Holbrook*, and thus error.  *See Heyward*, 432 S.C. at 325, 852 S.E.2d at 467 (stating "we find any error in denying the motion to remove Heyward's shackles was harmless because Heyward was not prejudiced"); *see also infra* note 6.

320 S.C. at 209-10, 464 S.E.2d at 107.

This careful balancing of the competing interests—and articulation of the balancing on the record for the benefit of appellate courts—is necessary to honor the defendant's due process rights whenever the State seeks to restrain the defendant in the jury's presence. In *United States v. Samuel*, 431 F.2d 610 (4th Cir. 1970), the United States Court of Appeals for the Fourth Circuit held, "Whenever unusual visible security measures in jury cases are to be employed, we will require the district judge to state for the record, out of the presence of the jury, the reasons therefor and give counsel an opportunity to comment thereon, as well as to persuade him that such measures are unnecessary." 431 F.2d at 615. Similarly, the Supreme Court of the United States recognized the necessity the trial court "s[ee] the matter as one calling for discretion," *Deck*, 544 U.S. at 634, 125 S. Ct. at 2015, 161 L. Ed. 2d at 966, and refused to sanction the "discretionary" use of shackles when the trial court did not articulate a valid reason for them and "did [not] explain why, if shackles were necessary, he chose not to provide for shackles that the jury could not see," 544 U.S. at 634-35, 125 S. Ct. at 2015, 161 L. Ed. 2d at 966. This Court required balancing of the competing interests in *Tucker*, stating, "The trial judge is to balance the prejudicial effect of shackling with the considerations of courtroom decorum and security." 320 S.C. at 209, 464 S.E.2d at 107 (citing *Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 1061, 25 L. Ed. 2d 353, 359 (1970)).

Thus, a defendant in a criminal trial may not be required to wear handcuffs, leg shackles, or other restraints in the presence of the jury unless the trial court makes specific findings on the record as to the particular reasons the restraints are necessary. If the court finds restraints are necessary, it must make every reasonable effort to ensure the restraints are not visible to the jury. *See Deck*, 544 U.S. at 629, 125 S. Ct. at 2012, 161 L. Ed. 2d at 963 (stating the Due Process Clauses of "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial").

In this case, the trial court made no effort whatsoever to assess whether the shackles were necessary, nor to ensure the jury could not see them. The trial court's failure in this case to even consider Heyward's request was an abuse of discretion. *See State v. Hawes*, 411 S.C. 188, 191, 767 S.E.2d 707, 708 (2015) ("A failure to exercise discretion amounts to an abuse of that discretion." (quoting *Samples v. Mitchell*, 329 S.C. 105, 112, 495 S.E.2d 213, 216 (Ct. App. 1997))); *Fontaine v. Peitz*, 291 S.C. 536, 538, 354 S.E.2d 565, 566 (1987) ("When the trial judge is vested with

discretion, but his ruling reveals no discretion was, in fact, exercised, an error of law has occurred.").  We address whether this error warrants a new trial in section III.

### B.      Firearms Expert Testimony

During her testimony at trial, the granddaughter described the pistol Heyward placed on Tollison's kitchen table as "gold and rusty."  One investigator testified a similar pistol—"silver and black and rusty"—was recovered from the house where Heyward was renting a room.  Investigator David Collins was later called to testify whether the pistol found at Heyward's home was capable of being fired at the time he committed the crimes.  Heyward objected, arguing whether the gun was operational was not relevant.  The trial court ruled whether the gun was operational and could cause death or great bodily injury was relevant, using armed robbery and the pointing and presenting charge as examples to explain its ruling.

We agree with the trial court that Investigator Collins' testimony was relevant in Heyward's trial.  Whether a pistol is capable of being fired is relevant, for example, on a charge of burglary in the first degree.  *See* S.C. Code Ann. § 16-11-311(A)(1) (2015) (providing a person is guilty of burglary in the first degree if he enters a dwelling without consent with intent to a commit a crime and is either "armed with a deadly weapon" or "uses or threatens the use of a dangerous instrument").  The operational capabilities of a firearm *could* also be relevant to malice—an element of murder—which requires the State to prove the defendant acted with an intent to harm.  *See, e.g.*, *State v. Belcher*, 385 S.C. 597, 609 n.5, 685 S.E.2d 802, 808 n.5 (2009) ("The term malice indicates a formed purpose and design to do a wrongful act . . . ." (quoting *State v. Fennell*, 340 S.C. 266, 275 n.2, 531 S.E.2d 512, 517 n.2 (2000))).

On appeal to the court of appeals, however, the State argued only that the testimony was relevant as to armed robbery, pointing and presenting a firearm, and malice.  The court of appeals did not address the malice argument, apparently because the trial court had not specifically mentioned it among the examples it cited to illustrate its ruling, but observed that neither armed robbery nor the crime of pointing and presenting a firearm requires the weapon to be capable of being fired.  *Heyward*, 432 S.C. at 316-18, 852 S.E.2d at 462-63; *see* S.C. Code Ann. § 16-11-330 (A) (2015) (providing a person may be guilty of armed robbery "using a representation of a deadly weapon"); S.C. Code Ann. § 16-23-410 (2015) (making it unlawful to point either a loaded or unloaded firearm, indicating operability is not essential to the crime).  The State now concedes the testimony was not relevant to armed robbery or pointing and presenting a firearm.  The State did not argue to this Court the testimony

was relevant to burglary or malice. Thus, we accept the State's concession the evidence was not relevant to the two crimes it argued. As we will explain in section III, however, the admission of Investigator Collins' testimony—if error—did not prejudice Heyward.

### C. Fingerprint Card Authentication

Fingerprints found at a crime scene can be very important evidence in a criminal trial, and the State can use them to make a convincing connection between a suspect and the crime. The theory behind the connection is obvious—*if* the State can prove whose fingerprints they are, the State has proven the person was present at the scene of the crime and may have proven (depending on the circumstances) who committed the crime. The connection depends, however, on the State's ability to prove whose prints they are. To do this, a fingerprint expert must compare the unknown prints from the crime scene to another set of prints the expert knows belong to a particular suspect. These are typically called "known prints," and that term is defined—according to Investigator Odom's testimony at trial—as "a full set of ten fingerprints taken from a known source." When the comparison of the unknown crime-scene prints and the known prints demonstrates both sets of prints belong to the same person, the State has established the connection.

Heyward's objection at trial and his argument before this Court are based on his contention the State offered the New Jersey fingerprint card as the "known prints" in Investigator Odom's comparison analysis. Thus, Heyward argues, the State was required to meet the authentication requirements set forth in *State v. Rich*, 293 S.C. 172, 173-74, 359 S.E.2d 281, 282 (1987), as "clarified" in *State v. Anderson*, 386 S.C. 120, 128, 687 S.E.2d 35, 39 (2009). As we will explain, however, this case is different from *Rich* and *Anderson* on two important points. First, the "known prints" in this case are the booking prints taken from Heyward when he was arrested, so the State was not required to rely only on a fingerprint card on file at a local law enforcement agency or on AFIS as was the case in *Rich* and *Anderson*.[2] Second, the

---

[2] In both *Anderson* and *Rich*, the State did not use post-arrest ("booking") fingerprints to prove the fingerprints from the crime scene belonged to the defendant. Rather, the State's expert compared the crime-scene prints with a fingerprint card on file at the South Carolina Law Enforcement Division (SLED) to prove the crime-scene prints belonged to the defendant. To make this comparison, the State was required to authenticate the SLED fingerprint cards as "known prints." *See Anderson*, 386 S.C. at 124, 687 S.E.2d at 37 (summarizing the testimony of the Lieutenant "in charge of the crime information center at SLED" as to when the

State authenticated the New Jersey fingerprint card through Odom's comparison of that card to the known booking prints card, an option not available to the State in *Rich* or *Anderson* because in those cases there were no booking prints. *See* Rule 901(b)(3), SCRE (stating "the following are examples of authentication . . . conforming with the requirements of this rule: **(3) Comparison by Trier or Expert Witness.** Comparison . . . by expert witnesses with specimens which have been authenticated").

As to the first point, the following dates are important. The crimes occurred on Sunday, October 11. Odom had the crime-scene prints uploaded into AFIS on October 12 and promptly received back the New Jersey fingerprint card bearing Heyward's name. Odom compared the unknown crime-scene prints to the New Jersey prints the same day and concluded both sets of prints belonged to the same person. Based in part on Odom's conclusion, investigators presented the photographic lineup to the granddaughter later on October 12. The granddaughter identified Heyward as the man she watched strangle her grandmother. Officers arrested Heyward and took the booking prints on October 13. Odom compared the crime-scene prints to the booking prints on October 16 and again concluded the crime-scene prints belonged to Heyward.

During Odom's testimony at trial, Heyward objected to statements Odom made in three reports prepared on October 12 in which she indicated the crime-scene prints and the New Jersey prints were a match. After the trial court excused the jury to hear the objection, Heyward argued, "Judge, the analysis and the evidence that they are about to bring into the record is that the items analyzed on the 12th were compared against a . . . print card [Odom] received from the AFIS system." Here, Heyward correctly argued the October 12 comparison could not make the necessary connection to show his presence at the crime scene unless the State authenticated the New Jersey fingerprint card as known prints by proving the fingerprints on the New Jersey card were Heyward's prints, as we found the State failed to do in *Rich* and succeeded doing in *Anderson*. *See Rich*, 293 S.C. at 173, 359 S.E.2d at 282 (finding the State did not prove the prints on the card belonged to the defendant); *Anderson*, 386 S.C. at 128-32, 687 S.E.2d at 39-41 (stating, "we find . . . the State presented

---

defendant's fingerprint card was made and how it was stored to demonstrate the prints on the card belonged to the defendant); *Rich*, 293 S.C. at 173, 359 S.E.2d at 281 (stating the fingerprint expert used an "inked card bearing a name and signature" from SLED's files to compare to the crime-scene prints).

sufficient evidence to authenticate the ten-print card," and then discussing four subsections of Rule 901, SCRE, the State satisfied).

The State then made authenticating the New Jersey fingerprint card as Heyward's known prints unnecessary, however, by having Investigator Odom explain to the trial court—still outside the jury's presence—that her opinion the crime-scene prints belong to Heyward was based on her comparison of the crime-scene prints and the booking prints, not based only on the comparison she originally made to the New Jersey prints.

> Solicitor: In doing your analysis, did you only rely on the card originally that came from AFIS on the 12th or did you rely on his booking prints as well?
>
> Odom: The first three reports, which were all written on the 12th, I obviously used the only card we had, which was the one generated through [AFIS]. When I did the kind of shoring up of everything else and did the remainder of the comparisons, I then had that card that had been rolled at [the jail].
>
> Solicitor: So when you did your final comparison on the -- I believe it was the 16th -- you used both the original card obtained from AFIS and the South Carolina card obtained at booking?
>
> Odom: Yes.

This is the first point that distinguishes this case from *Rich* and *Anderson*. Having thus established that the crime-scene prints belonged to Heyward by comparing the crime-scene prints to Heyward's booking prints, it was unnecessary for the State to offer the October 12 comparison results into evidence, and unnecessary for Odom to discuss the New Jersey fingerprint card, to make the connection between the known booking prints and the crime-scene prints.

What is required to authenticate a particular piece of evidence is necessarily determined by what the proponent claims the evidence is. "The requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question *is what its proponent claims*." Rule 901(a), SCRE (emphasis added). Unlike in *Anderson* and *Rich*, the

State in this case did not need to claim the New Jersey fingerprint card was the "known prints" component of Investigator Odom's final October 16 comparison analysis. Rather, it appears the State was using the New Jersey card to explain to the jury how Heyward became a suspect. In other words, the State claimed the New Jersey fingerprint card, with Heyward's name on it, was the thing that made Heyward a suspect and led officers to put his picture in the photographic lineup presented to the granddaughter. Focusing on the authentication requirement the State prove the New Jersey card is what the State claimed it is, the authentication requirement would be satisfied in this case simply by having Odom testify "this is the fingerprint card I received back from AFIS, based on which we developed Heyward as a suspect." That testimony by itself would be sufficient for the trial court to find the card was what the State claimed, and thus that it was properly authenticated.

Even so, the State authenticated the New Jersey fingerprint card as illustrated in Rule 901(b)(3) when Odom testified she compared the New Jersey card to the booking prints and both sets of prints were made by the same person. Thus, the trial court acted within its discretion to admit the New Jersey fingerprint card as properly authenticated.

### D. Autopsy Photos

The State called Dr. Amy Durso—the pathologist who conducted Tollison's autopsy—as an expert witness. Dr. Durso testified the cause of Tollison's death was "strangulation." In addition, she explained "all of the violence, including all of the bruising and contusions, fractures, not only to her neck, but also her head and her left arm." She began her explanation by describing the injuries apparent from her exterior examination of Tollison's body. She stated, for example,

> So the things that really stood out to me were the findings mostly around her neck. She had a [ligature] furrow where it looked like she had been strangled with some kind of – something wrapped around her neck. She had bruises and abrasions around her neck. She had what we call "petechial hemorrhages" around her face and her eyes, and she had other bruises and injuries primarily involving her left arm.

She then explained that "petechial hemorrhages" are "the breaking of tiny blood vessels . . . below the skin surface or within the sclera of the eyes, the white parts of your eyes," and those result "often in the more violent strangulations." She also

described a "bruise on the underside of her chin," which she explained "is a very common finding in strangulations."

After describing the injuries she could see from her external examination, Dr. Durso began to explain what she found on the inside of Tollison's body. She explained the work she did in Tollison's torso and neck area and then turned to her work on Tollison's head after she "reflected" the scalp.[3] She stated,

> At that point, we realized that she had multiple bruises around her head, not just to one surface, but . . . to at least four different planes, which is not – it can't just be from a fall. You know, there had to be some kind of multiple blunt force injuries.

When asked, "[W]hen you did the external exam, were you able to see those injuries or do they only manifest internally," Dr. Durso answered essentially that she could see the head injuries only after reflecting the scalp. At this point, the State offered two gruesome autopsy photographs that showed what Tollison's head looked like after Dr. Durso reflected the scalp. The photos showed the inside of Tollison's scalp and the tissue normally covered by the scalp. Heyward objected pursuant to Rule 403, SCRE, and the trial court excused the jury from the courtroom.

To begin the hearing that followed, the trial court asked the State to proffer Dr. Durso's testimony regarding the photos.

Solicitor: Dr. Durso, when you reflected the scalp back and noticed these injuries, please tell the Court what significance they had in your ultimate conclusions and in the performance of this autopsy?

Dr. Durso: So it demonstrates that there was a struggle and that there – it was a violent death, the fact that her head had to have been struck on multiple different planes, not just one from a terminal fall, but it actually demonstrates that there was more than just a

---

[3] Dr. Durso explained "reflecting" the scalp begins "by making the incision on the back of the head" and pulling the scalp forward over the face to expose the inside of the scalp and the tissue normally covered by the scalp.

strangulation, that her head had been struck on multiple different areas.

Solicitor: And are these injuries part of the cause of death in this case?

Dr. Durso: It contributes to it, yes.

Dr. Durso then testified the two photos—which she called "the best examples that were gathered at the autopsy"—were "necessary" to assist her "in explaining these injuries to the jury and the cause of death."

After the proffer, the trial court heard arguments from Heyward and the State on Heyward's Rule 403 objection. *See* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). The trial court then put its analysis of the objection on the record, beginning with its assessment of the probative value of the photographs. After summarizing Dr. Durso's testimony during the proffer, the trial court found the photographs were "corroborative of the testimony that has been previously presented . . . [and] corroborative of the testimony of Dr. Durso." The court stated "the probative value is high."

Turning to unfair prejudice, this Court has consistently recognized since at least 1986 that gruesome autopsy photographs carry the inherent tendency to cause an emotional reaction on the part of the jury. *See, e.g., State v. Middleton*, 288 S.C. 21, 24, 339 S.E.2d 692, 693 (1986) (explaining autopsy photographs similar to the ones at issue in this case have potential "to arouse the sympathies and prejudices of the jury"). We recently discussed a long line of our cases in which we criticized the casual admission of gruesome autopsy photographs because of the emotional reaction they tend to cause. *State v. Nelson*, ___ S.C. ___, 891 S.E.2d 508, 511-13 (2023). *See also State v. Torres*, 390 S.C. 618, 624, 703 S.E.2d 226, 229 (2010) ("Today, we strongly encourage all solicitors to refrain from pushing the envelope on admissibility in order to gain a victory which, in all likelihood, was already assured because of other substantial evidence in the case."). This potential for an emotional reaction is the essence of the danger of unfair prejudice. *See State v. Jones*, 440 S.C. 214, 259, 891 S.E.2d 347, 371 (2023) (stating "photographs are unfairly prejudicial if they 'create a "tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one"'" (quoting *State v. Franklin*, 318 S.C. 47, 55, 456 S.E.2d 357, 361 (1995))); *see also Old Chief v. United States*, 519 U.S. 172, 180, 117 S. Ct. 644, 650, 136 L. Ed. 2d 574, 587-88 (1997)

("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."). In every case in which the State seeks to introduce gruesome autopsy photographs, therefore, the trial court must acknowledge the significant danger that the photos will cause unfair prejudice.[4]

In two recent cases—*Jones* and *Nelson*—we found the trial court erred in admitting gruesome photos because the inherent tendency of the photos to cause unfair prejudice substantially outweighed what we found was very little probative value. In *Nelson*, for example, we found, "Under a Rule 403, SCRE, analysis, the photos had limited probative value." ___ S.C. at ___, 891 S.E.2d at 514. Our finding in *Nelson* of limited probative value was based on two important observations we made after a careful study of the record of the trial. First, in defense counsel's opening statement to the jury in that case, he admitted the truth of every potentially disputed fact except *who* committed the crime. ___ S.C. at ___, 891 S.E.2d at 510. "We disagree about one thing," defense counsel told the jury, "Who killed her." *Id.* Primarily because of this concession, we found "the information gained from the autopsy photos was not in question," and the "facts evidenced by the autopsy photos" were "undisputed." ___ S.C. at ___, 891 S.E.2d at 513. Second, we found "these photos provide no insight as to who killed Victim." ___ S.C. at ___, 891 S.E.2d at 514. "Thus," we stated, "we do not believe the autopsy photos corroborate Daniel's testimony that Carmie killed Victim." *Id.*

This case is different from *Nelson* on both points. Here, Heyward conceded nothing in his trial. As to the head injuries Dr. Durso testified were shown by the autopsy photos, Heyward specifically denied Tollison suffered those injuries during the crime sequence. In his argument to the trial court that the photos should be excluded, Heyward's counsel stated, even after hearing Dr. Durso's testimony to the contrary, "Again, this is just rabid speculation. There is no proof that those injuries happened during the course of the struggle which, again, unfortunately ended Ms. Tollison's

---

[4] The court of appeals stated "we find [the photographs] were not unduly prejudicial." *Heyward*, 432 S.C. at 323, 852 S.E.2d at 466. As we have explained here and in previous cases, however, and as Justice Kittredge explains in his concurring opinion, gruesome autopsy photographs always carry an inherent danger of *unfair* prejudice. The question, therefore, is not whether autopsy photographs pose a danger of unfair prejudice, but whether that danger substantially outweighs the probative value under Rule 403.

life." Counsel then suggested the head injuries occurred in the very manner Dr. Durso testified the photos refute—that the injuries occurred from a fall. This leads to the second point. If Heyward had accepted Dr. Durso's finding the head injuries did not occur during a fall, or even if he had not specifically challenged the finding, her testimony might not have needed corroboration. In either circumstance, we would likely agree with Justice Kittredge's conclusion the photos had little probative value. Given counsel's specific challenge to the finding, however, it made perfect sense for the trial court to find "high" probative value in the extent to which the photos corroborate Dr. Durso's testimony.

It is important here that the granddaughter—the only eyewitness to the crimes—did not testify Heyward beat Tollison in the head. Thus, the *only* evidence Tollison suffered "multiple blunt force injuries" to her head was Dr. Durso's testimony from her observations after reflecting Tollison's scalp and the autopsy photographs corroborating Dr. Durso's testimony. The State stresses this "gap in the testimony from the granddaughter" in its brief as support for the probative value of the autopsy photographs and points out that in her closing argument the solicitor argued Heyward returned to Tollison after he put the granddaughter in the closet "to finish her off." This would explain why the granddaughter did not see Heyward hit Tollison in the head. Also, while the head injuries were not the direct cause of Tollison's death, these injuries independently support Heyward's conviction for assault and battery in the first degree.

Rule 403 requires the trial court to balance the probative value of the evidence against the danger of unfair prejudice. In this case, the trial court engaged in that balancing and placed its reasoning on the record. When a trial court finds the evidence has "high" probative value and—importantly—when we find evidence in the record that logically supports the trial court's finding, our discretionary standard of review requires that we affirm.

In recent years, this Court has scrutinized the admission of gruesome autopsy photographs more and more closely. We will continue to do so. It remains true, however, that when the trial court actually exercises its discretion in balancing the inherent danger of unfair prejudice posed by these photographs against "high" probative value, and puts its reasoning on the record for the appellate court to review,[5] the trial court's ruling that the danger of unfair prejudice does not

---

[5] Dr. Durso's testimony the photographs were "necessary" for her explanation to the jury of the head injuries is not insignificant, but the testimony is by no means dispositive of the Rule 403 objection. Rather, whether the trial court's ruling is

substantially outweigh the probative value is a decision that we will almost always find within the trial court's discretion. *See Morris v. BB&T Corp.*, 438 S.C. 582, 587, 885 S.E.2d 394, 397 (2023) ("The exercise of discretion is then to follow a thought process that begins with the trial court's clear understanding of the applicable law, continues with the court's sound analysis of the situation before it in light of the law, and ends with the trial court's ruling that follows the law and is supported by the facts and circumstances. The trial court's recognition of its responsibility to exercise discretion will be apparent when the record indicates the court followed such a thought process." (citations omitted)).

### E.    Heyward's Alias

We affirm the court of appeals as to this issue for the reasons it explained, *Heyward*, 432 S.C. at 318-20, 852 S.E.2d at 463-64, and pursuant to Rule 220(b), SCACR, and the following authorities: Rule 403, SCRE ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."); *Vasquez v. State*, 388 S.C. 447, 459, 698 S.E.2d 561, 567 (2010) (describing circumstances in which arguments meant to arouse religious animosity are prohibited).

### III.   Harmless Error

We have repeatedly observed we will not reverse a criminal conviction for the erroneous admission of evidence unless the defendant shows on appeal the error was prejudicial. *See, e.g., State v. Byers*, 392 S.C. 438, 444, 710 S.E.2d 55, 58 (2011) ("To warrant reversal based on the wrongful admission of evidence, the complaining party must prove resulting prejudice."). In this case, Heyward was convicted of murder by violent strangulation, burglary in the first degree, armed robbery, two

---

within its discretion is determined by the *trial court's analysis*, as reflected on the record. This is another point on which this case differs from *Nelson*. In that case, as far as we can tell from the record, the trial court simply relied on the testimony of the pathologist who stated, according to the trial court, "it would help him show the jury the cause of death." ___ S.C. at ___, 891 S.E.2d at 510. The record in *Nelson* contains no other analysis by the trial court. In this case, on the other hand—in remarkable contrast to the lack of analysis on the shackling issue—the trial court did put its own analysis on the record, noted the importance of considering the particular crimes being tried and their elements, and stated the photographs "indicate[] a struggle, a violent death, multiple injuries, . . . *more than just strangulation*."

counts of kidnapping, assault and battery in the first degree, pointing and presenting a firearm, and unlawful possession of a firearm by a person convicted of a crime of violence. The evidence showed Heyward not only strangled Tollison to death but also severely beat her about her head and body, and he tied up a child victim with electrical cords and kept her restrained in a closet while he rummaged around the house looking for items to steal. In *this* case, the fact a witness testified the pistol Heyward used to accomplish the crimes was operational in the sense that it was capable of firing a bullet could not possibly have had any impact on the outcome of the trial. We find any error in the admission of Investigator Collins' testimony was harmless beyond a reasonable doubt because it could not possibly have prejudiced Heyward. *See State v. Reyes*, 432 S.C. 394, 405–06, 853 S.E.2d 334, 340 (2020) ("Some errors—when considered in the context of the facts of a particular case—are so insignificant and inconsequential they do not require reversal of a conviction.").

Visible shackles on a defendant, however, are "inherently prejudicial," and thus, when "a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635, 125 S. Ct. at 2015, 161 L. Ed. 2d at 966 (first quoting *Holbrook*, 475 U.S. at 568, 106 S. Ct. at 1345, 89 L. Ed. 2d at 534). Rather, the error requires reversal unless the State "prove[s] 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" *Id.* (first alteration added) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710 (1967)).

We find the State did that in this case by conclusively proving Heyward's guilt with other overwhelming evidence such that no other rational conclusion could be reached except that he is guilty of each crime. *Reyes*, 432 S.C. at 406, 853 S.E.2d at 340. We have already recounted much of the evidence on which we rely to reach this conclusion, including—most notably—the fact Heyward's DNA was found under Tollison's fingernails and on her neck. The State's DNA expert testified "the frequency of seeing this [DNA] profile in . . . the African-American population [is] approximately one in 21,000,000,000,000,000,000. We also rely on the fact Heyward's fingerprints were found at the crime scene. As context for this DNA and fingerprint evidence, there is no evidence Heyward had ever been inside Tollison's house, nor that Heyward had any other contact with Tollison that could have led to his DNA being under her fingernails. The only other times Heyward and Tollison ever met were within one week before the crimes when, first, Tollison stopped briefly by the home of Mattie Canzater—where Heyward rented a room—to drop off yard sale signs, and second, two days before the crimes when Canzater asked Heyward for help retrieving tables Tollison offered to loan Canzater for use at the

yard sale. Heyward provided the help, but did not go inside Tollison's home. The court of appeals discussed other evidence that supports our conclusion no other rational conclusion could be reached except that Heyward is guilty. *Heyward*, 432 S.C. at 318, 852 S.E.2d at 463.

In light of this overwhelming evidence of Heyward's guilt, we find the trial court's error in shackling him in the presence of the jury was harmless error beyond any reasonable doubt.[6]

## IV. Conclusion

For the reasons stated above, we affirm Heyward's convictions.

**AFFIRMED AS MODIFIED.**

**JAMES, J. and Acting Justices Kaye G. Hearn and Stephanie P. McDonald, concur. KITTREDGE, Acting Chief Justice, concurring in a separate opinion.**

---

[6] The State argues the error is harmless for the separate reasons "nothing in the record indicates that any juror could or did see his shackles" and "the shackles were removed [after the jury was sworn] for [the] trial." We do not accept this argument, nor do we agree with the portion of the court of appeals' opinion that appears to accept it. *See Heyward*, 432 S.C. at 325-27, 852 S.E.2d at 467-68 (discussing *State v. Johnson*, 422 S.C. 439, 458, 812 S.E.2d 739, 749 (Ct. App. 2018), and other cases distinguishable from this one). When Heyward's counsel raised the issue by asking the shackles be removed, it was the trial court's responsibility—as explained above—to justify the shackling as in some legitimate State interest, and if justified, to make every reasonable effort to ensure the shackles were not visible to the jury. The reason "nothing in the record indicates" the jury could see the shackles is the trial court refused to fulfill this responsibility. We will not find harmless error on this basis.

**ACTING CHIEF JUSTICE KITTREDGE**: I concur in result. I join Justice Few's well-reasoned majority opinion, with one exception. I respectfully disagree with the majority's determination that the trial court did not abuse its discretion in admitting the challenged autopsy photographs. Pathologist Dr. Amy Durso testified in great detail as to the victim's additional injuries beyond the strangulation. Dr. Durso graphically described the nature and extent of these additional injuries, which she referred to as "multiple blunt force injuries." As stated in the majority opinion, "the State offered two gruesome autopsy photographs that showed what [the victim's] head looked like after Dr. Durso reflected the scalp." In my firm judgment, the trial court erred in admitting the two gruesome autopsy photographs. Given the graphic and detailed testimony of the pathologist, the horrific autopsy photographs were unnecessary. *See State v. Kornahrens*, 290 S.C. 281, 288–89, 350 S.E.2d 180, 185 (1986) ("[P]hotographs of the murder victims should be excluded where the facts they are intended to show have been fully established by competent testimony."). I am convinced the photographs were intended for the sole purpose of arousing "the sympathies and prejudices of the jury." *See State v. Middleton*, 288 S.C. 21, 24, 339 S.E.2d 692, 693 (1986). I find as a matter of law that the probative value of the autopsy photographs here is substantially outweighed by the danger of unfair prejudice. I nevertheless concur in result on the basis of harmless error, as demonstrated in the majority opinion.

I add two observations. First, this Court has repeatedly cautioned restraint in the admission of gruesome autopsy photographs due to their inherent tendency to evoke an emotional reaction from the jury. I respectfully urge our state's fine prosecutors and trial court judges to heed our admonition rather than rely on the possibility of an appellate court rescuing a conviction on harmless error grounds. In doing so, I harken back to a fundamental principle: "Prosecutors are ministers of justice and not merely advocates." *State v. Quattlebaum*, 338 S.C. 441, 449, 527 S.E.2d 105, 109 (2000). They must ensure an accused is afforded his constitutional rights and that any conviction is based on proper evidence admissible under the rule of law. *See* Rule 3.8 cmt. 1, RPC, Rule 407, SCACR. Should a prosecutor instead push the envelope and pursue a guilty verdict at all costs—for example, by seeking to introduce dubious evidence designed to improperly inflame the emotions of the jury—the prosecutor's actions fail to serve justice. *See State v. Jones*, 343 S.C. 562, 578, 541 S.E.2d 813, 822 (2001).

Second, returning to the case here, and in keeping with its past practices in similar cases, the State at trial and on appeal sought to justify the admission of the autopsy

photographs largely on the basis that the gruesome photographs proved malice.[7] According to the State, the more horrific and gruesome autopsy photographs are, the greater the malice. However, this reflects a fundamental misunderstanding of malice.

Malice is a legal term of art that "indicates a wicked or depraved spirit intent on doing wrong." *State v. Kelsey*, 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998). Malice "signifies . . . a general malignant recklessness of the lives and safety of others." *State v. Mouzon*, 231 S.C. 655, 662, 99 S.E.2d 672, 675–76 (1957) (quoting *State v. Heyward*, 197 S.C. 371, ---, 15 S.E.2d 669, 671 (1941)). Thus, in the legal context, malice connotes "a formed purpose and design to do a wrongful act under the circumstances that exclude any legal right to do it." *State v. Fennell*, 340 S.C. 266, 275 n.2, 531 S.E.2d 512, 517 n.2 (2000) (citation omitted).

There are no degrees of malice—it either exists, or it does not. It follows, then, that a "gruesome" murder does not necessarily contain a greater degree of malice than a less violent murder. Take the following scenarios to illustrate this simple fact. In the first scenario, Defendant A has no history with the victim but, after drinking too much at a bar, gets into an argument with another bar patron and violently murders him with a broken beer bottle. The murder scene is bloody and gruesome, as are the autopsy photographs. In the second scenario, Defendant B slowly poisons and ultimately murders a close family member over an extended period of time. The presence of the poison is detected through testing of tissue samples, yet the autopsy reveals no visible injuries. Malice exists in both scenarios, but no one with a minimum understanding of the law would suggest Defendant A demonstrated greater malice than Defendant B.

In this case, the solicitor relied primarily on the malice argument to justify the admission of the autopsy photographs. The trial court followed suit in remarking that the autopsy photographs were "essential in proving the necessary element such as malice." The trial court further observed: "Courts and juries cannot be too squeamish about looking at unpleasant things . . . especially when the truth is on trial." I agree that "the truth is on trial," but the pursuit for truth must be done in a manner that ensures a fair process. In law, the ends do not justify the means. In our justice system, "the truth" is not the sole criteria for the admissibility of evidence,[8]

---

[7] The majority opinion avoids reliance on the malice argument, instead articulating its own (and more convincing) rationale for the admission of the photographs.

[8] There are numerous examples where "the truth" is excluded from evidence, including—among a host of other examples—evidence seized as a result of an

including autopsy photographs.  To find otherwise would mean all autopsy photographs must be admitted into evidence, for they are "the truth."  We can do better.

---

unlawful search and seizure; confessions to law enforcement obtained in violation of constitutional rights; propensity evidence; and relevant (and perhaps truthful) evidence for which the probative value is substantially outweighed by the danger of unfair prejudice.